R. READ TULL AND WIFE, JULIA P. TULL; E. REED GASKIN AND WIFE, JEAN H. GASKIN; DEWITT D. PHILLIPS, JR., (SINGLE); L. HAMPTON SHORT AND WIFE, LOUISE SHORT; DAVID GOE WELTON AND WIFE, SYDNEY L. WELTON; SAM HILLER AND WIFE, EVELYN T. HILLER; GERALD P. SINKOE AND WIFE, FAITH SINKOE; MRS. BANNA B. KNAUFF (WIDOW); J.W. KNAUFF, JR., AND WIFE, MARGUERITE KNAUFF; LORRAINE G. WALLACE (SINGLE); FIRST UNION NATIONAL BANK OF NORTH CAROLINA (FORMERLY UNION NATIONAL BANK), TRUSTEE UNDER TRUST INDENTURE DATED DECEMBER 31, 1945, EXECUTED BY E. C. GRIFFITH AND FRANCES R. GRIFFITH; E. C. GRIFFITH COMPANY, AGENT FOR E. C. GRIFFITH AND WIFE, FRANCES R. GRIFFITH, PLAINTIFFS v. DOCTORS BUILDING, INC.; JOHN S. BROWN AND WIFE, LELIA BROWN; ERNEST K. BROWN (SINGLE); W. S. TAYLOR AND WIFE, AMBLER M. TAYLOR; MRS. RUTH G. BARR (WIDOW); EARLIE H. KEPLEY AND WIFE, ALICE S. KEPLEY; DR. ALBERT R. BLACK AND WIFE, JULIA W. BLACK; WILLIAM SYLVESTER SIMS AND WIFE, LOUISE S. SIMS; CLYDE HARRELLSON (WIDOWER); AMERICAN COMMERCIAL BANK, TRUSTEE; LEWIS M. AYER AND WIFE, IRENE T. AYER; MRS. LULA B. AUSTIN, (WIDOW); MABEL H. PITTLE (WIDOW); C. G. HUNGATE AND WIFE, BEULAH HUNGATE; ESTATE INVESTMENT COMPANY; HARRY SCHAFFER AND WIFE, MAYMIE SCHAFFER; ERNEST HINSON BROWN (SINGLE); JONES-BROWN REALTY COMPANY, INC.; J. A. JONES CONSTRUCTION COMPANY; RALPH A. CLEMMER AND WIFE, PEARL L. CLEMMER; F. TERRELL FRIDELL AND WIFE, HELEN J. FRIDELL; JOHNATHAN E. McCACHREN AND WIFE, INDIA J. McCACHREN; ARTHUR R. R. ANDREWS (SINGLE); SELENIA R. HENSON (WIDOW); MRS. ANNIE LOUISE COCHRANE (WIDOW); R. H. MARTIN AND WIFE, INEZ E. MARTIN; MRS. HELENE M. CHANTER (WIDOW); CASPER C. WARREN AND WIFE, LASSYE S. WARREN; ALFRED F. MALLUCK AND WIFE, HELEN B. MALLUCK; DWIGHT L. DAVIS AND WIFE, MILDRED W. DAVIS; E. T. ANDERSON AND WIFE, RUTH ANDERSON; H. V. JOHNSON AND SON, INC.; ROBERT M. DOWD, JR., AND WIFE, DOROTHY J. DOWD; MRS. MARIE C. ARBOR (WIDOW); VESTA O. SLAUGHTER (WIDOW); WILLIAM P. FARTHING AND WIFE, COLLEEN K. FARTHING; FRED STERN AND WIFE, EDNA T. STERN; THOMAS E. COLLINS AND WIFE, NELL J. COLLINS; IRA H. BLACK AND WIFE, MARGARET N. BLACK; HARRY F. SIMMONS AND WIFE, MARGARET F. SIMMONS; JAMES P. HINSON AND WIFE, CLARA B. HINSON; BEN J. BROADWAY, SR., AND WIFE, BONNIE G. BROADWAY; ROBERT M. HILL AND WIFE, MARTHA J. HILL; MRS. CLARA ASHCRAFT DEININGER (WIDOW); WILLIAM A. McGHEE AND WIFE, DOROTHY L. McGHEE; MARY C. HANFORD AND HUSBAND, JOHN VAN HANFORD; ROBERT H. PERCIVAL AND WIFE, KATHLEEN R. PERCIVAL; GEORGE N. HARRILL (SINGLE); RUTH W. HORTON AND HUSBAND, H. L. HORTON; EDGAR S. LANEY AND WIFE, HAZEL M. LANEY, DEFENDANTS.

(Filed 16 June, 1961.)

TULL *v.* DOCTORS BUILDING, INC.

**1. Deeds § 19—**

Where the owner of a large tract of land subdivides it into numerous tracts and files a separate map as to each tract, which map shows a general plan of development for that tract, each tract is a separate subdivision for the purpose of construing the restrictive covenants.

**2. Same—**

Where the record discloses a map of a subdivision showing numbered lots restricted to use for residential purposes and also a portion of land marked "reserved unrestricted," the portion marked "reserved unrestricted" remains outside of the general scheme of development and the use of such portion for commercial purposes does not affect the validity of the restrictive covenants in regard to the numbered lots.

**3. Same—**

Restrictive covenants constitute negative easements running with the land, enforceable *inter se* by the grantees in the deeds containing such restrictions and also by all purchasers by *mesne* conveyances from such grantees, even though their immediate deeds contain no restrictions.

**4. Same—**

Changes in character of the use of land adjacent to but outside the area of a subdivision restricted to residential purposes does not affect the validity and enforceability of the residential restrictions, there being no change in use within the covenanted area.

**5. Same—**

The violation of covenants restricting the use of lots within a development to residential purposes, even though acquiesced in by the owners of other lots within the development, will not estop such other owners from enforcing the restrictions unless the violations of the restrictions amount to such a radical or fundamental change as to destroy for practical purposes the essential objects and purposes of the residential restrictions, and each case must be determined upon its particular facts.

**6. Same—**

The fact that several lots in a residential development are paved and used for parking in connection with an office building lying outside the area of the development, and that owners of other lots within the development have acquiesced in such use, will not estop such other owners from enforcing the restrictive covenants when they have objected to and refused to permit the erection of any commercial structure on any of the lots within the residential area.

**7. Same—**

The fact that a municipality opens up a street on a part of a lot in a subdivision in which all the lots are restricted to residential purposes does not violate or negate the residential restrictions.

TULL *v.* DOCTORS BUILDING, INC.

**8. Same—**

Valid restrictions limiting the use of lots within a development to residential purposes are neither nullified nor superseded by a subsequent zoning ordinance of the municipality within which the subdivision lies.

**9. Same—**

Valid restrictive covenants constitute a species of incorporeal property right, and equity will not relieve a grantee of his contractual obligations in regard thereto merely because they have become burdensome, but must give effect to the covenants unless changed conditions within the covenanted area are so radical as to destroy the essential objects of the scheme of development and such changes have been acquiesced in by the owners of other lots so as to constitute a waiver or abandonment of their rights to enforce the restrictions.

**10. Equity § 1—**

Equity will not override the law or invalidate contracts or destroy property rights.

**11. Deeds § 19—**

In an action under the Declaratory Judgment Act to determine the enforceability of restrictive covenants in a residential development, judgment upholding the restrictions upon supporting findings of fact and conclusions of law will be upheld, but provision of the judgment retaining the cause for further proceedings will be striken out.

**12. Judgments § 3—**

The court properly refuses to grant relief prayed for by a plaintiff in an unverified motion, when such relief is not supported by plaintiff's complaint.

APPEAL by plaintiffs from *Craven, S. J.*, 6 February 1961, Special Civil Term of MECKLENBURG.

Action brought by plaintiffs pursuant to the provisions of our Declaratory Judgment Act, G.S. 1-253 *et seq.*, for a judicial determination as to their rights, if any, to use their lots in a subdivision in Myers Park in the city of Charlotte for other than residential purposes.

Plaintiffs and defendants constitute all of the persons who own any interest in the numbered lots shown on plaintiffs' Exhibit 1, except the owners of those numbered lots who have filed a release in the office of the register of deeds for Mecklenburg County, releasing all restrictions on said lots. This is plaintiffs' Exhibit 1:

TULL *v.* DOCTORS BUILDING, INC.

PLAINTIFFS' EXHIBIT NO. 1

Plaintiffs own in fee lots 4, 5, 6, 7, and 8 in block G, lots 1, 2, 3, 4, 5, 6, and 10 in block J, and lots 3, 8, and 9 in block P, as shown on plaintiffs' Exhibit 1.

The following named defendants, Doctors Building, Inc.; John S. Brown and wife, Lelia Brown; Ernest K. Brown (Single); American Commercial Bank, Trustee; Mrs. Lula B. Austin (Widow); Harry Schaffer and wife, Maymie Schaffer; Ernest H. Brown (Single); Jones-Brown Realty Company, Inc.; J. A. Jones Construction Company; Ralph A. Clemmer and wife, Pearl L. Clemmer; Arthur R. R. Andrews (Single); Mrs. Annie Louise Cochrane (Widow); Casper C. Warren (Widower); Alfred F. Malluck and wife, Helen B. Malluck; H. V. Johnson and Son, Inc.; Vesta O. Slaughter (Widow); Ira H. Black and wife, Margaret N. Black; Robert H. Percival and wife, Kathleen R. Percival; Edgar S. Laney and wife, Hazel M. Laney; John Van Hanford and wife, Mary C. Hanford; Mrs. Mabel H. Pittle (Widow); C. G. Hungate and wife, Beulah Hungate were duly served with process, filed no answers or other pleadings, the time for answering or filing any pleading had expired, and Judge Craven entered a judgment by default final against them. Judge Craven in this judgment held it was an action to remove a cloud from the title of plaintiffs' lots, and adjudged that these defendants have no easement, right, estate or interest in the lots of plaintiffs tending to limit or restrict the use to which these lots may be put, and plaintiffs have the right to use these lots for other than residential purposes, or to use the same for business purposes, or to erect any business building thereon without any lawful claim adverse to plaintiffs existing on the part of any of these defendants. There is no exception to this judgment by default final.

All the other defendants, who were duly served with process and filed answers, and plaintiffs, pursuant to G.S. 1-184—1-185, waived trial by jury, and agreed that Judge Craven might find the facts, make conclusions of law, and render judgment thereon.

## RELEVANT FINDINGS OF FACT.

"2. On July 8, 1931, The Stephens Company owned all of the numbered lots and the blocks marked 'Reserved Unrestricted' shown on plaintiffs' Exhibit 1, although the map which is Exhibit 1 was not made and recorded in the Mecklenburg Public Registry until January 17, 1940.

"3. On July 8, 1931, The Stephens Company caused to be made and recorded in the Mecklenburg Public Registry in Map Book 3 at Page 600 a map of the property shown on plaintiffs' Exhibit 2 as Standard Oil Company and Boar's Head, which were designated Lots 1 and 2, respectively, in Block R."

Tull *v.* Doctors Building, Inc.

PLAT SHOWING A PORTION
OF
THE STEPHENS CO. PROPERTY
CHARLOTTE, N C

SCALE 1"=30        A V BLANKENSHIP,
MARCH, 1947        CIVIL ENGINEER
F B DAVIS, OFFICE ENGINEERING
ROBERT PHARR, FIELD ENGINEERING        CHARLOTTE, N.C.

PLAINTIFFS' EXHIBIT NO. 2

"4. On July 25, 1931, The Stephens Company conveyed the Boar's Head lot to one N. F. Baxter; that this lot was not restricted to residential use by The Stephens Company, and that the lot was described in the deed as Lot 2, Block R, as shown in Map Book 3 at Page 600.

"5. On February 9, 1937, The Stephens Company conveyed the Standard Oil lot to Standard Oil Company of New Jersey and the lot was described in the deed as Lot 1, Block R, as shown in Map Book 3 at Page 600 of the Mecklenburg Public Registry; that this conveyance contained no restriction to residential use.

"6. The area on plaintiffs' Exhibit 1 south of Morehead Street and east of Kings Drive was at one time owned by The Stephens Company and is shown on a map of Myers Park dated February, 1936, which map is recorded in Map Book 4, Page 76, in the Mecklenburg County Registry.

"7. On January 17, 1940, The Stephens Company had prepared and recorded plaintiffs' Exhibit A; that this exhibit was recorded in Map Book 4 at Page 401 in the Mecklenburg Public Registry; that at the time this map was put on record The Stephens Company owned all of the numbered lots shown on said map and all of the three tracts designated 'Reserved Unrestricted,' excepting approximately one-third of the 'Reserved Unrestricted' area at the northwesterly intersection of East Morehead Street and Kings Drive, which had been previously sold to Mr. Baxter and Standard Oil Company, as described above.

"8. The Stephens Company by a restriction between itself and Dr. A. R. Black and wife, Consuello G. Caldwell Black, restricted all of the numbered lots facing Kings Drive on plaintiffs' Exhibit 1 so that they could be used for 'residential purposes only.' Said restriction agreement was dated February 17, 1940, and was recorded in Book 997 at Page 275 of the Mecklenburg Public Registry; that a copy of said restriction agreement is attached hereto.

"9. The Stephens Company restricted the remainder of the numbered lots shown on plaintiffs' Exhibit 1 by instruments filed in Book 1446, Page 412, Book 491, Page 277, Book 1097, Page 235 and Book 1299, Page 502, 'for residential purposes only.'

"10. In April of 1947, The Stephens Company caused to be made and recorded in Map Book 5 at Page 438 the map shown as plaintiffs' Exhibit 2. At the time this map was made and recorded The Stephens Company owned all of the lots shown thereon, excepting those lots marked Standard Oil Company and Boar's Head.

"11. On March 24, 1948, The Stephens Company conveyed lots 18 and 19 in Block P as shown on plaintiffs' Exhibit 2 to Doctors Building, Inc.; that this conveyance did not contain restrictions requiring residential use of the lot.

"12. In December of 1951, The Stephens Company conveyed by metes and bounds descriptions all of the tracts marked 'Reserved Unrestricted' located at the southerly end of Kings Drive, as shown on plaintiffs' Exhibit A, and all of the tract marked 'Reserved Unrestricted' located at the southeasterly intersection of East Morehead Street and Kings Drive; that in December of 1951, The Stephens Company conveyed Lots 20 and A as shown on plaintiffs' Exhibit 2; that these conveyances were made to The Stephens Company stock-

holders as part of a plan of dissolution; that these conveyances did not contain restrictions requiring residential use.

"13. Except to locate some of the corners, none of the aforesaid deeds of The Stephens Company made any reference to plaintiffs' Exhibit 1 (Map Book 4, Page 401) to describe the areas conveyed and no restrictions against the use of such property for residential purposes were placed in said deeds.

"14. The Stephens Company had followed a custom in many of its maps which are recorded in the Mecklenburg County Registry of showing areas other than the platted lots on said maps. Such areas were divided into lots on other maps which were either previously recorded in the Mecklenburg Registry or later recorded in the Mecklenburg County Registry. The Stephens Company has placed many maps on record in the Mecklenburg Public Registry of different subdivisions of Myers Park.

"15. The Stephens Company restricted the numbered lots on plaintiffs' Exhibit 1 for 'residential purposes only' as a subdivision comprised of said lots only and in pursuance of a general plan of development or improvement.

"16. Substantially all of the lots facing Kings Drive in Blocks J, K, L, M, 18 and Q on plaintiffs' Exhibit 1 have fine, substantial residences on them; that Lots 4 through 8 in Block G are vacant and Lots 11 through 17 in Block P do not contain any structures on them and are used as parking lots as hereinafter set out. The City of Charlotte has opened a street connecting Kings Drive and Blythe Boulevard on a portion of Lot 14.

"17. No structures of any type have been erected on any numbered lots in the subdivision, except single family residences and duplexes.

"18. All of the residences in the subdivision have been built since 1940 and many have been built in the past ten years. The majority of the residences are occupied by owners. The yards are nicely landscaped and well kept. At least two of the defendants have made recent improvements within the past years on their homes costing $6,000.00 and $8,000.00 respectively.

"19. The City of Charlotte, by proper ordinance, has zoned all of the numbered lots and all of the areas marked 'Reserved Unrestricted,' as shown on plaintiffs' Exhibit 1, as follows:

"(1) All of the numbered lots not fronting on Kings Drive are zoned Residence 1." Then follows a specification of the uses permitted under such zoning.

"(2) That all of the numbered lots, fronting on Kings Drive, have

been zoned Residence 2." Then follows a specification of the uses permitted under such zoning.

"(3) That all of the three areas marked 'Reserved Unrestricted' and Lots 4, 5, 6, 7 and 8 in Block G, and Lots 15, 16, 17 in Block P, all as shown on plaintiffs' Exhibit 1, have been zoned Business 1." Then follows a specification of the uses permitted under such zoning.

"20. At the present time there is located on the tract at the southwesterly intersection of Kings Drive and East Morehead Street an alcoholic beverage control board store, an Esso service station, a two-story office building containing a branch office of Investors Diversified Services, Inc., a one-story office building containing a branch office of Addressograph-Multigraph-Varityper Corporation, a one-story office building containing a branch office of the Underwood Corporation, and a ten-story office building which contains, among other things, a cafeteria, a pharmacy, a dispensing optician, a branch of the Wachovia Bank and Trust Company, the Mecklenburg County Medical Library, a beauty shop, an artificial limb shop, a uniform shop, the Medical Management Company, the Zimmer Baxter Company, 101 physicians and dentists and approximately 200 nurses and technicians; that the structures contained on this tract are those indicated by the schedule accompanying plaintiffs' photographic exhibits.

"21. At the present time there is located upon the tract at the southeasterly intersection of Kings Drive and East Morehead Street a three-story office building containing the offices of the eastern marketing division of The Pure Oil Company, a filling station, a restaurant, and a laundry and dry cleaning establishment; that these structures are as shown on the schedule accompanying the plaintiffs' exhibits.

"22. At the present time there is located upon the tract marked 'Reserved Unrestricted,' located at the southerly end of Kings Drive, a two-story medical building which is occupied by approximately twenty physicians and their nurses and technicians and is surrounded by a large parking lot; that this building is as indicated by the schedule accompanying the plaintiffs' exhibit.

"23. The Stephens Company is dissolved and is no longer in existence.

"24. Independence Boulevard is one of the busiest streets in the City of Charlotte, and on its six lanes carries approximately 25,000 cars per day; that at the present time Kings Drive, south of Brunswick Avenue, has but two lanes of traffic and on these lanes travel approximately 12,500 cars per day; that on a per lane basis Kings Drive is 25% more heavily traveled than some parts of Independence Boulevard; that Kings Drive is not a truck route and almost all of

the vehicles travelling on said street are privately owned automobiles.

"25. On account of the heavy volume of traffic carried by Kings Drive, the City of Charlotte, in April of 1960, widened from 30 feet to 55 feet the paved portion of Kings Drive between the East Morehead section and Brunswick Avenue and installed a traffic control device at the intersection of Kings Drive and Brunswick Avenue; that because of the heavy volume of traffic carried by Kings Drive, the City of Charlotte, within the immediate future, is going to widen the paved portion of the remainder of Kings Drive from 30 to 45 feet and operate it as a four-lane street with on street parking prohibited at all times; that is shown on plaintiffs' Exhibit 1, Kings Drive was dedicated by The Stephens Company with a right of way of 70 feet.

"26. The ten-story office building, described above, is located on Lots 18 and 19 of Block B, as shown on plaintiffs' Exhibit 2, and is built so that its southerly wall runs from east to west approximately four feet distant from the length of the northerly line of Lot 17 in Block B.

"27. In said ten-story office building there are employed, in addition to the 101 physicians and dentists and 200 nurses and technicians, 78 persons in the various businesses set forth in paragraph 11 above.

"28. The said ten-story building is owned by one of the defendants, Doctors Building, Inc.; that this defendant has leased the space in said building to all of the physicians, dentists and businesses described above.

"29. To provide parking space for the 278 people who work in this building and the patients and customers who come to it, the defendant, Doctors Building, Inc., at the time it opened its building in 1950, had Lots 15, 16 and 17 paved with 2 inches of crushed rock and 4 inches of asphalt, inclosed, marked off, and turned into a parking lot capable of holding 259 cars; that said lots have been used for parking continuously since 1950.

"30. In 1955 Brunswick Avenue was run in an east-west direction through the northerly three-fourths of Lot 14 in Block P as shown on plaintiffs' Exhibit 1; that this portion of Brunswick Avenue leads into the grounds of Charlotte Memorial Hospital, which will be a 600 bed hospital when the wing now under construction is completed.

"31. In 1955 the defendant, Doctors Building, Inc., leased from the defendant, J. A. Jones Construction Company, Lot 13 and the southerly one fourth of Lot 14 in Block P as shown on plaintiffs' Exhibit 1, and that this area was paved like the lots described in paragraph 19 above, marked off and has been used as a parking lot continuously since 1955.

"32. In 1956 the defendant, Doctors Building, Inc., leased Lot 12

in Block P as shown on plaintiffs' Exhibit 1 from the defendant, Jones-Brown Realty Company, and turned the same into a paved parking lot; that in 1957 the defendant, Doctors Building, Inc., purchased Lot 11 in Block P as shown on plaintiffs' Exhibit 1 and turned the same into a parking lot; that Lot 12, since 1956 and Lot 11, since 1957, have been used continuously as parking lots.

"33. The uniform lease executed by the Doctors Building, Inc., with its tenants, requires the Doctors Building, Inc., to furnish parking for tenants, employees, patients and customers of tenants; that the only space furnished by the Doctors Building, Inc., for parking is on Lots 11, 12, 13, part of 14, 15, 16, and 17 in Block P and on Memorial Place, to the rear of these lots, as shown on plaintiffs' Exhibit 1; that the said defendant owns and leases no other space within the area where such parking could be furnished.

"34. The capacity of parking lots located on Lots 11, 12, 13, 15, 16, 17 and part of 14 in the area of Memorial Place to the rear of these lots is 469 automobiles; the automobiles of persons using the facilities located in the said ten-story building come and go from said lots during the day, with the result that a minimum of 1,000 automobiles use this parking lot each day.

"35. The patients and customers of the tenants of said ten-story building pay nothing as they enter or leave said parking lot, nor are they required to exhibit any evidence of the fact that they have used any of the facilities in said ten-story building; that it would be possible for the general public to use said lots and not enter the ten-story building.

"36. In no time since it began the operation of said parking lots in 1950, has the defendant, Doctors Building, Inc., ever been requested by any person, firm or corporation to cease to park automobiles thereon.

"37. Although none of the owners of other lots in the subdivision made formal objection to such use of said lots for the type of parking described above, the defendants refused to allow the use of Lots 16 and 17 in Block P for a proposed addition to the Doctors Building in 1955 and such proposed addition was placed to the rear of the existing Doctors Building, outside the subdivision.

"38. On two occasions since 1955, the defendants have refused to release the restrictions for the purpose of permitting buildings other than residences on the vacant lots in Block G.

"39. No structure of any sort has been erected on any of said parking lots.

"40. All of the lots owned by the plaintiffs are North of Ardsley

Road, as shown on plaintiffs' Exhibit 1, and all of the lots owned by the answering defendants are South of Ardsley Road as shown on said map; that the plaintiffs' lots are substantially more valuable for nonresidential use than for residential use.

"41. The unnumbered tract shown on Block J of plaintiffs' Exhibit 1, which is located immediately to the rear of Lots 1 - 10 in said Block, has located thereon the Miller Clinic; that the Miller Clinic Building is as represented by the plaintiffs' photographic exhibits and can be identified by using the schedule thereto attached."

## CONCLUSIONS OF LAW.

"1. The numbered lots on plaintiffs' Exhibit 1 comprise an integral subdivision and uniform restrictions were imposed upon all of such lots restricting their use to residential purposes only; such restrictions were placed on said lots in conformity with a general plan for development and such restrictions constitute negative easements running with the land and are enforceable by the immediate and remote grantees of The Stephens Company *inter-se.*

"2. Any changes which may have taken place or any land use which is made of land adjacent to but outside the area embraced in the subdivision (the numbered lots on plaintiffs' Exhibit 1) is irrelevant and has no legal effect upon the validity of the restrictions placed on the lots within the subdivision.

"3. The use by Doctors Building, Inc., of all of Lots 11, 12, 13, 15, 16, 17 and part of Lot 14 in Block P, as shown on plaintiffs' Exhibit 1, for parking purposes in conjunction with operation of its office building, is a violation of the restrictive covenants requiring residential use of these lots; that such use does not constitute a major change within the subdivision nor does such use render it impossible to enforce the general plan of use of said lots in the subdivision for residential purposes only. The aforesaid use of said lots does not materially affect the enjoyment of the property of the defendants and the failure of the defendants to object to such use of said lots, coupled with the fact that the defendants have consistently objected to any structure other than a residence being erected on any lots in the subdivision, does not now estop the defendants from enforcing the restrictions that the lots within the subdivision to be used for residential purposes only.

"4. The restrictions set forth in Book 997, page 275, in the Mecklenburg County Registry are valid and binding on all of the land in the subdivision and that the plaintiffs are not entitled to make any use of their land within said subdivision inconsistent with said restrictions.

"5. The court is of the opinion that Lots 4, 5, 6, 7, 8 in Block G and

Lots 15, 16 and 17 in Block P, as shown on plaintiffs' Exhibit 1, should be released from the restrictions requiring residential use; that the court would adjudge that these lots are so released, except for the court's further opinion that the law requires either a complete abrogation of the restrictive covenants on all of the lots in the subdivision, or a complete enforcement of the restrictive covenants as to all of the lots in the subdivision."

Whereupon, Judge Craven adjudged and decreed that the relief sought by plaintiffs is hereby denied, and plaintiffs are ordered to make no use of any lots they may own shown as a numbered lot on the map recorded in Map Book 4, page 401, for any purpose other than residential purposes. The action was retained for further proceedings as may appear necessary from time to time.

On the same day Judge Craven signed the above two judgments, 8 February 1961, and after they were signed, Dewitt D. Phillips, Jr., one of the plaintiffs, filed with Judge Craven a written motion alleging in substance: He owns lot 3 in Block J as shown on plaintiffs' Exhibit 1. He is a practicing physician who has converted the structure located on his lot into an office for his use. As a result of the judgment in this case he will have to reconvert his structure to residential use at considerable expense, and move his office to another location. His lot is located very near the lots used by the defendant, Doctors Building, Inc., for parking purposes. Inasmuch as this plaintiff will be required to cease his nonresidential use of his lot, the judgment in this case should require not only that plaintiffs should cease nonresidential use of their lots, but that all defendants, including Doctors Building, Inc., should in like manner cease non-residential use of their lots. Wherefore, he prays that the court should adjudge and decree that all numbered lots shown on plaintiffs' Exhibit 1 are subject to the restrictive covenants appended to the findings of fact, and that all the owners of numbered lots shown on said map are required to use their lots in conformance therewith. Judge Craven denied his motion without comment.

From the judgment rendered in which a jury trial was waived, the plaintiffs appeal, and from the denial of the motion of the plaintiff, Dewitt D. Phillips, Jr., the plaintiffs appeal.

*McClenenghan, Miller & Creasy By F. A. McCleneghan; and Dockery, Ruff, Perry, Bond & Cobb By James O. Cobb for plaintiffs, appellants.*

*Bell, Bradley, Gebhardt, DeLaney & Millette By Ernest S. DeLaney, Jr., for defendants, appellees.*

PARKER, J. All the defendants, who were not parties to the judgment by default final, filed a joint answer, except W. S. Taylor and wife, Ambler M. Taylor, and George N. Harrill, single. There is nothing in the record to show these three defendants were served with process.

There are no exceptions to the judge's findings of fact, which would indicate there is no dispute as to the facts. The judgment states oral evidence was introduced, but none of it is in the record. We have copied verbatim from the record filed in this Court the findings of fact. A close reading of these findings of fact would seem to indicate there are some minor typographical errors.

Plaintiffs have three assignments of error. Their first assignment of error is to the judge's conclusions of law 1, 2, and 4, and to that part of conclusion of law 3 following the words "does not constitute a major change."

In respect to conclusion of law 1. Findings of fact 8 is: "The Stephens Company by a restriction between itself and Dr. A. R. Black and wife, Consuello G. Caldwell Black, restricted all of the numbered lots facing Kings Drive on plaintiffs' Exhibit 1 so that they could be used for 'residential purposes only.' Said restriction agreement was dated February 17, 1940, and was recorded in Book 997 at Page 275 of the Mecklenburg Public Registry; that a copy of said restriction agreement is attached hereto." The restriction agreement provides the Stephens Company "will hold all of said lots which remain unsold subject to said restrictions." This agreement further provides: "It is understood and agreed that the property shown upon said map as 'Reserved Unrestricted' may be held and conveyed by The Stephens Company free of any restrictions or subject to such restrictions as it may desire to impose upon the same." Finding of fact 9 is: "The Stephens Company restricted the remainder of the numbered lots shown on plaintiffs' Exhibit 1 by instruments filed in Book 1446," etc., " 'for residential purposes only.' " The findings of fact show that the areas shown on the map marked plaintiffs' Exhibit 1 marked "Reserved Unrestricted" were never restricted for residential use, and are now used for business and professional purposes on a large scale. Finding of fact 15 is: "The Stephens Company restricted the numbered lots on plaintiffs' Exhibit 1 for 'residential purposes only' as a subdivision comprised of said lots only and in pursuance of a general plan of development or improvement." It is to be noted The Stephens Company did not reserve the right to change the residential restrictions within the subdivision composed of numbered lots, and did not reserve any of these lots in this subdivision free from such restrictions. Finding of fact 17 is: "No structures of any type have been erected

on any numbered lots in the subdivision, except single family residences and duplexes." Finding of fact 16 is: "Substantially all of the lots facing Kings Drive in Blocks J, K, L, M, 18, and Q on plaintiffs' Exhibit 1 have fine, substantial residences on them; that Lots 4 through 8 in Block G are vacant and Lots 11 through 17 in Block P do not contain any structures on them and are used as parking lots as hereinafter set out. The City of Charlotte has opened a street connecting Kings Drive and Blythe Boulevard on a portion of Lot 14."

The findings of fact show many subdivisions of Myers Park by The Stephens Company and many maps. Many of these maps are not in the record. This Court has held "that the subdivisions of Myers Park are each a separate, distinct and integral development, and that Myers Park, consisting originally of 1100 acres was not planned and developed as a unit, composed of these subdivisions." *Johnston v. Garrett,* 190 N.C. 835, 130 S.E. 835; *Stephens Co. v. Homes Co.,* 181 N.C. 335, 107 S.E. 233; *McLeskey v. Heinlein,* 200 N.C. 290, 156 S.E. 489; *Higdon v. Jaffa,* 231 N.C. 242, 56 S.E. 2d 661.

This Court said in *Sedberry v. Parsons,* 232 N.C. 707, 62 S.E. 2d 88: "These principles are well settled in this jurisdiction: 1. 'Where the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee, either on the theory that there is a mutuality of covenant and consideration, or on the ground that mutual negative equitable easements are created.' 26 C.J.S., Deeds, section 167; *Higdon v. Jaffa,* 231 N.C. 242, 56 S.E. 2d 661; *Brenizer v. Stephens,* 220 N.C. 395, 17 S.E. 2d 471; *Bailey v. Jackson,* 191 N.C. 61, 131 S.E. 567; *Homes Co. v. Falls,* 184 N.C. 426, 115 S.E. 184.

"2 The right to enforce the restrictions in such case is not confined to immediate purchasers from the original grantor. It may be exercised by subsequent owners who acquire lots in the subdivision covered by the general plan through *mesne* conveyances from such immediate purchasers. *Higdon v. Jaffa, supra.*

"3. The restrictions limiting the use of land in the subdivision embraced by the general plan can be enforced against a subsequent purchaser who takes title to the land with notice of the restrictions. *Higdon v. Jaffa, supra; Davis v. Robinson,* 189 N.C. 589, 127 S.E. 697.

"4. A purchaser of land in a subdivision is chargeable in law with notice of restrictions limiting the use of the land adopted as a part of a general plan for the development or improvement of the subdivision if such restrictions are contained in any recorded deed or other instrument in his line of title, even though they do not appear in his im-

mediate deed. *Higdon v. Jaffa, supra; Sheets v. Dillon,* 221 N.C. 426, 20 S.E. 2d 344; *Turner v. Glenn,* 220 N.C. 620, 18 S.E. 2d 197; *Bailey v. Jackson, supra.* . . .

"The primary test of the existence of a general plan for the development or improvement of a tract of land divided into a number of lots is whether substantially common restrictions apply to all lots of like character or similarly situated. *Phillips v. Wearn,* 226 N.C. 290, 37 S.E. 2d 895; *Humphrey v. Beall,* 215 N.C. 15, 200 S.E. 918; 14 Am. Jur., Covenants, Conditions, and Restrictions, section 202; 26 C.J.S., Deeds, section 167."

The unchallenged findings of fact amply support the judge's conclusions of law 1. These findings of fact further clearly show that the areas or tracts of land marked "Reserved Unrestricted" on the map marked plaintiffs' Exhibit 1 are not, and never have been a part of the separate, distinct and integral subdivision of numbered lots shown on this map reserved for residential uses only. The assignment of error to conclusion of law 1 is overruled.

In respect to conclusion of law 2. On this point we are favored with only a meager discussion in plaintiffs' brief. The fact that adjoining or surrounding property outside of the area embraced in the subdivision of numbered lots restricted for residential purposes only shown on the map marked plaintiffs' Exhibit 1 is now used for business and professional purposes on a large scale, does not alter the character of the residential subdivision itself. This Court said in *Brenizer v. Stephens,* 220 N.C. 395, 17 S.E. 2d 471: "It is generally held that the encroachment of business and changes due thereto, in order to undo the force and vitality of the restrictions, must take place within the covenanted area." Citing voluminous authority. See also: *Turner v. Glenn,* 220 N.C. 620, 18 S.E. 2d 197; *Vernon v. Realty Co.,* 226 N.C. 58, 36 S.E. 2d 710; *Higdon v. Jaffa, supra.* The assignment of error to conclusion of law 2 is overruled.

In respect to the assignment of error to part of conclusion of law 3. Neither the plaintiffs, nor Doctors Building, Inc., nor any defendant except to the first part of this conclusion of law which reads: "The use by Doctors Building, Inc., of all of Lots 11, 12, 13, 15, 16, 17 and part of Lot 14 in Block P, as shown on plaintiffs' Exhibit 1, for parking purposes in conjunction with operation of its office building, is a violation of the restrictive covenants requiring residential use of these lots."

In *Forstmann v. Joray Holding Co.,* 244 N.Y. 22, 154 N.E. 652, the Court said: "Doubtless the letter of such restriction has been violated by the defendants. But not every violation of a restrictive agreement

entitles an aggrieved party to equitable relief. Each case depends on its own circumstances."

The Court said in *Rombauer v. Compton Heights Christian Church,* 328 Mo. 1, 40 S.W. 2d 545, 553: "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement."

See also 14 Am. Jur., Covenants, Conditions and Restrictions, Sections 305, 306, 307; 26 C.J.S., Deeds, Section 171; Thompson on Real Property, Permanent Edition, Vol. 7, Section 3651.

On the subject of changed conditions as affecting the enforcement of restrictive covenants, the cases are legion. Many of them are discussed or cited in Notes in 54 A.L.R. 812, 85 A.L.R. 985, 103 A.L.R. 734, 4 A.L.R. 2d 1111. The cases, of course, deal with different facts, and it seems it is not possible to reconcile many of the holdings on substantially similar facts. A full discussion of the subject is likewise to be found in *Booker v. Old Dominion Land Co.,* 188 Va. 143, 49 S.E. 2d 314, and in *Pitts v. Brown,* 215 S.C. 122, 54 S.E. 2d 538.

The Court said in *Holling v. Margiotta,* 231 S.C. 676, 100 S.E. 2d 397: "We find no error in the conclusion of the lower court that the defendants failed to make out their defenses of laches, estoppel and waiver on the part of the plaintiffs. The free parking on the unoccupied portion of Lot No. 2 by customers while shopping in the nearby stores is not an objectionable commercial use of the lot. Utilization of the first floor of the garage apartment as a storage place for the adjacent grocery was an insubstantial commercial use These very limited uses for nonresidential purposes were not objected to by plaintiffs or the other residents of the subdivision but should not, in equity be held to have estopped them from asserting their right against the subsequent substantial violation by defendants."

Finding of fact 37 is to the effect, that though none of the owners of other lots in the subdivision made formal objection to the use by Doctors Building, Inc., of all of Lots 11, 12, 13, 15, 16, 17 and part of Lot 14 in Block P as shown on plaintiffs' Exhibit 1 for parking purposes in conjunction with the operation of its office building, defendants refused to allow the use of Lots 16 and 17 in Block P for a proposed addition to the Doctors Building in 1955, and such proposed addition was placed in the rear of its building outside the subdivision.

We are of the opinion, and so hold, that the unchallenged findings of fact do not show that the use of Lots 11, 12, 13, 15, 16, 17 and part of Lot 14 in Block P of this subdivision is such a radical or fundamental change or substantial subversion as practically to destroy the

essential objects and purposes of the restriction agreement, as to warrant the removal of the residential restrictions, thereby destroying this residential subdivision with many fine, well kept homes. It would be inequitable to hold otherwise. The assignment of error to the challenged part of conclusion of law 3 is overruled.

For the reasons set forth above plaintiffs' assignment of error to conclusion of law 4 is overruled.

In respect to the assignment of error to conclusion of law 5.

Finding of fact 17 is: "No structures of any type have been erected on any numbered lots in the subdivision, except single family residences and duplexes." Finding of fact 16 in part is: "The City of Charlotte has opened a street connecting Kings Drive and Blythe Boulevard on a portion of Lot 14." This Court said in *Callaham v. Arenson*, 239 N.C. 619, 80 S.E. 2d 619: "And ordinarily the opening and maintenance of a street or a right of way for the better enjoyment of residential property as such does not violate a covenant restricting the property to residential purposes." *Starmount Co. v. Memorial Park*, 233 N.C. 613, 65 S.E. 2d 134, cited and relied on by plaintiffs is factually distinguishable. In respect to the zoning of this subdivision by the city of Charlotte. "A valid restriction on the use of real property is neither nullified nor superseded by the adoption or enactment of a zoning ordinance, nor is the validity of the covenant thereby affected." 26 C.J.S., Deeds, p. 1181.

Business uses not permissible in this residential subdivision have gradually approached it on land outside this subdivision and not a part of it. The border lots in Block G and Lots 15, 16 and 17 in Block P as shown on the map marked plaintiffs' Exhibit 1, first feel the pressure. If equity should permit these border lots to deviate from the residential restriction, the problem arises anew with respect to the lots next inside those relieved from conforming. Thus, in time, the restrictions throughout the tract will become nugatory through a gradual infiltration of the spreading change.

"Contractual relations do not disappear as circumstances change. So equity cannot balance the relative advantages and disadvantages of a covenant and grant relief against its restrictions merely because it has become burdensome. It is bound to give effect to the contract unless changed conditions within the covenanted area, acquiesced in by the owners to such an extent as to constitute a waiver or abandonment, is made to appear. . . . Those who purchase property subject to restrictive covenants must assume the burdens as well as enjoy the benefits, for equity does not grant relief against a bad bargain voluntarily made and unbreached." *Vernon v. Realty Co., supra.* As set forth above, these changes within the covenanted area "must be so

radical as practically to destroy the essential objects and purposes of the agreement." *Rombauer v. Compton Heights Christian Church, supra.* As parties bind themselves so must the courts leave them bound.

*Cooper v. Kovan,* 349 Mich. 520, 84 N.W. 2d 859 (1957), was a proceeding by residential property owners to enjoin construction of commercial buildings in a subdivision. The circuit court·judge held that restrictive covenants on the subdivision were valid, but ordered a compromise permitting erection of buildings under specified conditions, and both parties appealed. The Court held that the restrictive agreements were valid, and there was no justification for compromise of restrictions so as to permit construction of buildings. The Court said in reference to whether the circuit judge sitting in equity had power to effect such a compromise in the face of and at the expense of existing and valid residential restrictions, "we are unable to find that the power lies in judicial hands."

Restrictive covenants are contractual in nature, and create a species of incorporeal property right. *Sheets v. Dillon,* 221 N.C. 426, 20 S.E. 2d 344. "But it is not the way of equity to override the law or to invalidate contracts or to destroy property rights." *Vernon v. Realty Co., supra.*

To release all the lots in Block G and Lots 15, 16, and 17 in Block P in direct violation of the valid residential restrictions here would undoubtedly substantially affect the value of every home in this subdivision. It is clear in our minds that residential restrictions generally constitute a property right of distinct worth, certainly to those who desire to keep their homes for residential use. A careful consideration of all the findings of fact shows no invalidation by the answering defendants of the residential restrictions by laches or waiver or acquiescence or estoppel, so as to warrant the removal of the restrictions. *Starkey v. Gardner,* 194 N.C. 74, 138 S.E. 408. It is not necessary for us to approve or disapprove of the judge's opinion that all of the lots in Block G and Lots 15, 16, and 17 in Block P should be released from the restrictions requiring residential use, but we do concur in his opinion as to the law set forth in conclusion of law 5. The assignment of error as to conclusion of law 5 is overruled.

The assignment of error to the signing of the judgment is overruled, for the reason that the unchallenged findings of fact, support the conclusions of law, and both support the judgment, with this exception: the judge erred in retaining the case for further proceedings as may appear necessary from time to time, and the judgment is ordered to be modified by striking this out.

Plaintiffs' last assignment of error to the denial by the judge to

sign a judgment as prayed for in the unverified motion of Dewitt D. Phillips, Jr., one of the plaintiffs, is overruled. Plaintiffs' complaint seeks no such relief.

It is to be noted that not a single defendant has excepted to any part of the judgment or appealed.

The judgment below is

Modified and Affirmed.