WILLIS CANTRELL AND WIFE, CAROLYN CANTRELL, v. WOODHILL ENTERPRISES, INC.

(Filed 17 April 1968.)

**1. Contracts § 5—**

Preliminary negotiations are merged into the subsequent written contract, and the written agreement is conclusive as to the terms of the bargain.

**2. Contracts § 23—**

An acceptance of work done under a construction contract ordinarily waives defects which are known to the owner or which are discoverable by inspection, but such acceptance does not waive latent defects of which the owner is ignorant at the time of acceptance or which may appear thereafter.

**3. Contracts § 21;    Sales § 6—**

A contractor or builder impliedly represents that he possesses the skill necessary to perform the job undertaken, and he has a duty to perform the work in a proper and workmanlike manner.

CANTRELL v. WOODHILL ENTERPRISES, INC.

**4. Contracts § 25—**

In an action for breach of a building or construction contract the complaint must allege the existence of a contract, the specific provisions breached, the facts constituting the breach, and the amount of damages resulting from such breach.

**5. Same;   Pleadings §§ 19, 24—**

A complaint which alleges generally that defendant erected a building "in an unskillful manner" is subject to demurrer for failure to allege facts constituting the faulty workmanship, but when the demurrer is sustained the plaintiff may then move for leave to amend his complaint to allege his cause of action properly.

**6. Pleadings §§ 2, 28—**

A general allegation of unskillful work is a defective statement of a cause of action, not a statement of a defective cause, and plaintiff's introduction of evidence tending to show latent defects caused by defendant's poor workmanship does not result in a variance between such allegation and proof, since variance occurs when the proof does not conform to the cause pleaded.

**7. Waiver § 3;   Contracts § 23—**

Waiver and estoppel are affirmative defenses which must be pleaded.

HUSKINS, J., took no part in the consideration or decision of this case.

APPEAL by plaintiffs from *Froneberger, J.,* 17 July 1967 Civil Session of GASTON, docketed and argued as Case No. 205 at the Fall Term 1967.

Action for breach of contract to construct a dwelling.

Summarized, except when quoted, the material allegations of the complaint are:

In December 1962, defendant submitted to plaintiffs a floor plan for a residence containing five rooms, a garage, and partial basement, all of specified dimensions. Thereafter, "defendant agreed to construct" the house in a first-class workmanlike manner on certain described lots owned by defendant, and to convey the property to plaintiffs for a total price of $13,400.00. Plaintiffs secured a loan through the Veterans' Commission, paid defendant the agreed purchase price, and, on 15 July 1963, defendant conveyed the property to plaintiffs by warranty deed. Thereafter, "plaintiffs determined that the residence was not constructed in accordance with the plans as agreed upon between the plaintiffs and defendant" in that (1) the floor space of all the rooms was less than contract specifications; (2) defendant landscaped only one-half of the property; and (3) defendant "erected said residence in an unskillful manner and contrary to the plans agreed upon." Defendant has refused to correct

the defects. In consequence, plaintiffs have been damaged in the amount of $2,427.60.

Answering the complaint, defendant averred: In consideration of $13,400.00, it constructed and conveyed to plaintiffs a house built in a first-class manner "according to plans and specifications which were approved by the plaintiffs, defendant, and the Veterans' Administration." Plaintiffs are entitled to recover nothing from defendant.

At the trial, plaintiffs' evidence tended to show: Sometime in 1962, Willis Cantrell (plaintiff) gave to O. L. Doster, president of defendant corporation, a rough sketch showing the floor plan of a split-level house containing three bedrooms, a living room, kitchen, bath, half-bath, and hall. The sketch (plaintiffs' exhibit 1), which had been drawn by plaintiff himself on a single sheet of paper, showed the dimensions of each room. Plaintiff delivered this sheet to Doster and told him it was "basically" what they wanted. Plaintiffs knew that defendant could not build a house by these plans. Doster told them that defendant would build a house having the desired floor plan on the land described in the complaint, landscape the property, and convey it to them for the sum of $13,400.00. Plaintiff requested Doster to obtain a 100% G. I. loan for him. On 19 September 1962, plaintiffs and defendant signed a contract in which defendant agreed to construct a house, "to be built in accordance with plans and specifications as submitted to the Veterans Administration." On the same day, defendant provided plaintiffs with a set of plans and specifications (defendant's exhibits 2 and 3), which plaintiff approved and signed. Thereafter, the Veterans' Administration approved these plans, and defendant began construction of the house in the latter part of February 1963.

During construction, it was discovered that the garage was not large enough to house plaintiff's Mercury station wagon. On 6 April 1963, plaintiffs signed a "request for acceptance of changes in approved drawings and specifications" to enable defendant to enlarge the garage, change the roof from plywood to boards, to revise the kitchen and living room, and to relocate a closet. The Veterans' Administration approved the requested changes on 19 April 1963, and defendant made them without cost to plaintiffs. Plaintiffs visited the house frequently while it was being constructed and observed that it "was not going to be as large as it was supposed to be."
When completed, each room contained from 17 to 39¾ fewer square feet than shown on the original sketch which plaintiff had given Doster; the basement contained 323¼ square feet less.

Plaintiffs moved into the house about a week prior to 18 June

1963. On that date they signed, upon a form provided by the Veterans' Administration, the following declaration of acceptance:

"I — We hereby declare that, in the company of O. L. Doster, the builder or his accredited representative, I — we inspected the residential property at the above address on June 18, 1963, and that without any reservation, I — we hereby accept the property as to condition of the house, other improvements, fixtures, and equipment; decoration; suitability; and readiness for use as my home, which I am purchasing or intend to purchase with loan guaranteed or insured by the Veterans Administration."

Mr. Harry Stroup, a field appraiser and inspector for the Veterans' Administration, also inspected the property. Plaintiff complained to him that the wall beside the basement stairs was rough; that defendant had not closed off a 12-foot shaft above the steps; and that no topsoil had been put in the front yard and the backyard had been seeded to a depth of only 30 feet. The specifications accompanying the blueprints provided for only 30 feet of seeding in the backyard. Mr. Stroup assured plaintiff that "all of that would be corrected and anything within a year that happened to the house would be corrected."

Plaintiff accepted the house of his own free will. When the loan on the house was closed on 15 July 1963, plaintiffs endorsed and delivered to defendant a check (made payable to plaintiffs) in the amount of $13,400.00. This was the first money defendant had received. Thereafter, because defective plywood had been used for the subflooring, the tile floors in the kitchen and living room "bucked up." Defendant took up the flooring, replaced it, and put down new tile which Mrs. Cantrell had selected. Later, the kitchen floor "bucked again." This time, however, defendant refused to replace it, and plaintiff himself corrected the defect at a cost of $50.00 for materials.

Plaintiff also testified to the following defects: The overhead cabinets in the kitchen pulled loose from the ceiling ¼ inch. The hardwood floors in the bedrooms and hall squeaked, and nailheads, which had been driven straight down instead of in the sides of the plank, stuck up in the floor because the filling which had been placed above them came out. (The evidence does not disclose just when the foregoing defects appeared.) The front door, the bathroom door, and the kitchen screened door *have never opened and closed properly.*

In plaintiff's opinion, the house had a value of only $10,500.00 when he moved into it. He sued for $2,427.60 because that was the figure furnished him by another contractor, who had based it "on

the difference in the size of the rooms (the) V. A. plan called for and difference in the sketch that I have here" (plaintiffs' exhibit 1) plus the cost of correcting "faulty workmanship." This figure included $140.70 for correcting defects in all the floors, and $300.00 "for the yard and others" except the size of the rooms.

Defendant's evidence tended to show: In August 1963, plaintiff gave Doster a floor-plan sketch (plaintiffs' exhibit 1) and asked him to figure the cost of building a house with the exterior dimensions shown thereon. Based on the sketch, Doster drew plans and specifications, which plaintiff approved and signed. These documents constituted the contract between the parties. Doster secured for plaintiff a hundred percent G. I. loan on the house in the amount of $13,400.00. After the foundation was laid, it was discovered that if the garage were built to plaintiffs' specifications, it would not contain his car. Defendant, after securing permission from the Veterans' Administration to make the change, lengthened the garage by two feet at his own expense. In an effort to satisfy plaintiff, defendant made certain other changes in the plans and specifications at no expense to plaintiff. The house was a "split-level." Plaintiff had insisted that it have an overhang on three sides, and the Veterans' Administration had approved this construction. As the work progressed, it became apparent that a steel beam was required to support the overhang. "When it (the overhang) bowed he (plaintiff) wanted it fixed." Because the beam was installed after the floors in the bedroom had been laid, it was necessary to do "face nailing." The resulting eighth-of-an-inch-deep nail holes were plugged with wood filler.

The Veterans' Administration made its final inspection of the house in June. From then until July 15th, when defendant conveyed the property to plaintiffs, they occupied it without charge. The first complaint they made was about the floors in the living room and kitchen. Defendant's investigation revealed that defective plywood had been used for the subflooring. The manufacturer replaced it, and these rooms were completely retiled in a pattern selected by plaintiffs. About a month later, plaintiff again complained about the floors. Upon inspection, Doster could find nothing wrong with either the flooring or the cabinets in the kitchen.

Defendant received plaintiffs' first complaint about the dimensions of the rooms in August 1964 by letter from their attorney. The only difference between the area contained in plaintiffs' sketch and the final plans is the width of the walls. "The square footage in this house and the sketch, using the exterior dimensions as shown, would be the same." Rooms are measured from the center of a partition

wall to the outside. The house was built according to the specifications except where better construction was substituted.

In Doster's opinion, plaintiffs' property was worth $14,000.00 when the house was completed. Defendant's profit on the job was $543.36. In the opinion of Mr. Harry Stroup, appraiser and compliance inspector for the Veterans' Administration, the property was worth $13,800.00. Stroup first inspected the construction on 16 March 1963, when he checked the dimensions of the footings. He found no discrepancies whatever in the plans and specifications. He made a second inspection on 10 April 1963. Again he found construction to be in compliance with the plans and specifications. His final inspection was made on 18 May 1963, after the house was completed. Plaintiffs were then on the premises and partially moved in. The only fault he found with the construction was that the windows had not been caulked — a minor detail. Plaintiffs made no complaint to him about the size of the rooms or the landscaping of the lot. He made no record of any complaints whatever and recalls none. During the year after the loan was closed, plaintiffs reported no dissatisfaction with the house to the Veterans' Administration.

At the close of all the evidence, defendant's motion for judgment of nonsuit was allowed, and plaintiffs appealed.

*Hollowell, Stott & Hollowell for plaintiff appellants.*
*Mullen, Holland & Harrell for defendant appellee.*

SHARP, J. This appeal involves only the question whether plaintiffs' evidence, together with that of the defendant which is favorable to them, will withstand the motion for nonsuit. 4 Strong, N. C. Index, Trial § 21 (1961). Plaintiff's complaint is (1) that defendant failed to construct the house according to specifications; (2) that the landscaping did not meet the specifications; and (3) that the residence was erected in an unskillful manner.

The express contract upon which plaintiffs sue consists of the plans and specifications, which plaintiff and defendant signed and the Veterans' Administration approved. The sketch which plaintiff gave Mr. Doster, and which he used as the basis for the final blueprints, was merely one facet of the preliminary negotiations which were merged in the subsequent written agreement between the parties. This agreement is conclusive as to the terms of the bargain. *Williams v. McLean,* 220 N.C. 504, 17 S.E. 2d 644; 1 Strong, N. C. Index, Contracts § 5 (1957). The evidence of plaintiffs and defendant shows that the house was constructed in conformity with the plans and specifications signed by the parties and approved by the

Veterans' Administration. Thus, plaintiffs failed to establish their allegation that the residence was not constructed in accordance with the plans and specifications.

With reference to landscaping, the contract provided, *inter alia,* that topsoil four inches thick should be placed on the front yard and that two shade trees be planted. Plaintiff testified that no topsoil was put on the front yard and that no shade trees were planted. Doster testified that all the required landscaping was done; that he planted no shade trees because there were two already on the lot. Be that as it may, if shade trees and topsoil were not provided as called for in the specifications, these omissions were obvious at the time plaintiffs moved into the house about 11 June 1963, at the time they signed the declaration of acceptance on 18 June 1963, and at the time they closed the loan and paid defendant the purchase price in full.

Plaintiffs' acceptance of the completed house and lot was in writing and unequivocal. It was executed neither under protest nor with reservations. Although plaintiff testified that he made certain complaints to Mr. Stroup at the time of the final inspection, there is no evidence that he protested to defendant. Acceptance manifests one's intent to receive the thing offered or tendered as one's own; it is a tacit agreement that the offerer — here the builder — has complied with his required duty. "Acceptance implies satisfaction and waives many rights." *Moss v. Knitting Mills,* 190 N.C. 644, 647, 130 S.E. 635, 636. See Black's Law Dictionary 27 (4th ed. 1951). In *Realty Co. v. Batson,* 256 N.C. 298, 123 S.E. 2d 744, this Court quoted with approval the following statement of the rules with reference to acceptance and waiver in building and construction contracts:

" 'Where work is accepted with knowledge that it has not been done according to the contract or under such circumstances that knowledge of its imperfect performance may be imputed the acceptance will generally be deemed a waiver of the defective performance. But this rule does not apply to latent defects. The acceptance of work which has been defectively done, the defects being unknown and not discoverable by inspection, does not amount to a waiver of the imperfect performance.' 12 Am. Jur., Contracts § 355. Annotation: 109 A.L.R. 625, 628. In *City of Seaside v. Randles* (Oregon), 180 P. 319, it is stated: 'An acceptance of work done under a construction contract does not constitute a waiver of latent defects of which the owner was ignorant at the time, or which may appear thereafter.' " *Id.* at 308, 123 S.E. 2d at 751. See also 13 Am. Jur. 2d, *Building and Construction Contracts* § 55 (1964).

Plaintiffs' evidence, taken in the light most favorable to them,

tends to show that at the time they accepted the property, there existed the following latent defects which were unknown to them and not discoverable by inspection: Defective subflooring in the living room and kitchen, poor workmanship in filling the nail holes in the hardwood floors in the hall and bedrooms caused by "face-nailing" in the rooms, and improper installation of the overhead cabinets in the kitchen.

It is the duty of every contractor or builder to perform his work in a proper and workmanlike manner, and he impliedly represents that he possesses the skill necessary to do the job he has undertaken. "In order to meet this requirement the law exacts ordinary care and skill only." *Moss v. Knitting Mills, supra* at 648, 130 S.E. 637; *accord, Byerly v. Kepley,* 46 N.C. 35.

The only allegation which plaintiffs make with reference to faulty workmanship in the house is the generalization that defendant "erected said residence in an unskillful manner." In an action for breach of a building or construction contract — just as in any other contract case — the complaint must allege the existence of a contract between plaintiff and defendant, the specific provisions breached, *the facts constituting the breach,* and the amount of damages resulting to plaintiff from such breach. I McIntosh, N. C. Practice & Procedure § 1066 (2d ed. 1956); 13 Am. Jur. 2d *Building and Construction Contracts* § 115 (1964); 9 C.J., *Building and Construction Contracts* § 241 (1916). The party who sues or defends upon the basis of a breach of contract " 'must allege it as well as the facts constituting it.' " *Yates v. Body Co.,* 258 N.C. 16, 22, 128 S.E. 2d 11, 15. "[W]here the cause of action is a failure to construct in a workmanlike manner and with the material contracted for, plaintiff's pleading should allege wherein the workmanship was faulty or the material furnished by defendant was not such as the contract required." 17A C.J.S. *Contracts* § 544 (1963). *Accord, Boettler v. Tendick,* 73 Tex. 488, 11 S.W. 497, 5 L.R.A. 270.

The rule with reference to pleading a breach of contract is no different from that which requires a plaintiff in a personal-injury action to plead the facts constituting the negligence which he claims proximately caused his injuries. " 'Negligence is not a fact in itself, but is the legal result of certain facts.' " *Stamey v. Membership Corp.,* 247 N.C. 640, 645, 101 S.E. 2d 814, 818. Likewise, a breach of contract is a legal result of certain facts. A plaintiff's failure to allege these facts renders the complaint subject to demurrer, but when the demurrer is sustained the plaintiff may then move for leave to amend his complaint in order to allege his cause of action properly. *Shives v. Sample,* 238 N.C. 724, 79 S.E. 2d 193.

In this case, defendant made no motion to strike the third portion of plaintiffs' cause of action, *i.e.*, the general allegation that it had constructed the house "in an unskillful manner." Had a motion to strike been made, it would have been allowed — with permission to amend, no doubt.

Plaintiffs' allegation of unskillful work was a defective statement of that part of their cause of action; it was not a statement of a defective cause. When plaintiffs introduced evidence from which the jury could have found that at the time they accepted defendant's work certain latent defects resulting from poor workmanship existed, there was no variance between this general allegation and their proof. G.S. 1-169. Variance occurs when the proof does not conform to the case pleaded. See *Zager v. Setzer,* 242 N.C. 493, 88 S.E. 2d 94; *Davis v. Rhodes,* 231 N.C. 71, 56 S.E. 2d 43. See also Note, 41 N.C.L. Rev. 647 (1963). The court therefore could not dismiss the action upon that ground even though defendant (assuming an amendment to its answer as indicated below) was entitled to a nonsuit or a directed verdict upon the other two portions of plaintiffs' cause of action. For that reason, the nonsuit must be reversed.

Since the case goes back for retrial, we also point out a defect in defendant's pleading. Waiver and estoppel are affirmative defences; yet defendant failed to plead plaintiffs' acceptance of the property in bar of their right to recover for its alleged failure to meet the specifications. See *Realty Co. v. Batson, supra.*

If there is to be a retrial of this case, no doubt both plaintiffs and defendant will move for permission to revamp their pleadings in order to bring them within the established rules.

Reversed.

HUSKINS, J., took no part in the consideration or decision of this case.