WILLIAM F. MEDEARIS, III AND WIFE, PAULINE PHISTER MEDEARIS, PETITIONERS-APPELLANTS v. TRUSTEES OF MYERS PARK BAPTIST CHURCH, C.D. SPANGLER FOUNDATION, INC., AND QUEENS COLLEGE, INC., RESPONDENTS-APPELLEES

No. COA01-114

(Filed 28 December 2001)

**Deeds— restrictive covenants—residential purposes—radical changes—implied waiver**

The trial court did not err in a declaratory judgment action determining the rights of petitioner homeowners to enforce a restrictive covenant requiring the pertinent property to be used only for residential purposes by granting summary judgment in favor of respondents who were attempting to expand a church complex by building a family life and learning center, because: (1) the changes to the pertinent restricted lots·are so radical as practically to destroy the essential objects and purposes of the agreement, thus terminating the restrictive covenant; (2) petitioners impliedly waived their rights to enforce the residential restrictions by their conduct and statements which led respondents to believe that petitioners dispensed with their right to challenge the nonconformity; and (3) enforcing the restriction would impose an undue hardship on respondents since they incurred tremendous expenses before petitioners filed suit.

Appeal by petitioners from judgment entered 21 November 2000 by Judge Forrest D. Bridges in Mecklenburg County Superior Court. Heard in the Court of Appeals 19 September 2001.

1

*DeVore, Acton & Stafford, P.A., by Fred W. DeVore, III, for petitioners-appellants.*

*Kennedy, Covington, Lobdell & Hickman, L.L.P., by Roy H. Michaux, Jr., for respondent-appellee Trustees of Myers Park Baptist Church.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, for respondent-appellee C.D. Spangler Foundation, Inc.*

*Guthrie, Davis, Henderson & Staton, P.L.L.C., by Robert E. Henderson, for respondent-appellee Queens College.*

BRYANT, Judge.

This is an appeal by William F. Medearis, III, and his wife, Pauline Phister Medearis [petitioners] from an order granting the Trustees of Myers Park Baptist Church [MPBC], the C.D. Spangler Foundation, Inc. [Foundation] and Queens College, Inc. [collectively "respondents"] summary judgment on a petition for declaratory judgment to determine the rights of the petitioner-homeowners to enforce a restrictive covenant. Petitioners assign as error the trial judge's granting of summary judgment to respondents after concluding, inter alia, that: 1) real property that was restricted to residential use only had undergone such a radical change as to practically render the restrictive covenant nugatory; and 2) petitioners waived their right to enforce the restriction.

The facts of this case span eighty-five years and are not in dispute. At issue is a residential restriction covering twelve of fourteen lots in Block 37 of the Myers Park subdivision in Charlotte. Petitioners seek to prevent respondents from expanding a church complex by building the Cornwell Family Life and Learning Center [Cornwell Center], named after the Spangler family.

From 1914 to 1921, the Stephens Company developed Block 37, dividing it into fourteen lots. *See* Illustration 1. The lots are numbered as follows: 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14A and 14B. There is no Lot 2. Lots 3 through 14A form a rectangle, with Lots 3 through 8 on one side, and Lots 9 through 14A on the other, 9 being across from 8. Lots 3 through 14A contain identical deed restrictions, including a covenant that the property only be used for residential purposes. The deeds also provide that "[i]t is expressly understood and agreed . . . that all of the foregoing covenants, conditions and restrictions, which are for the protection and general welfare of the community shall be covenants running with the land." Lots 1 and 14B are

adjacent to Lots 3 and 14A, respectively. They do not contain residential restrictions.[1]

By 1929, ten of the twelve restricted lots had residences on them. *See* Illustration 2. Two of the ten lots—9 and 10—were owned and continue to be owned by the Medearis family. In 1943, the Efirds transferred lots 1, 14A and 14B to MPBC. Between 1948 and the early 1950s, MPBC built a sanctuary and educational building on Lots 1 and 14B, the unrestricted lots. In 1955, MPBC acquired Lot 3 to provide for the future expansion of the church. The structure on the lot was used for church offices. In the early 1960s, plans were approved for construction of a classroom building, fellowship hall and church offices on Lots 1, 3 and 14A. The structure on Lot 3 was demolished to clear the way for this construction. No waivers from the residential restrictions on Lots 3 and 14A were requested.

In 1962, Queens College transferred Lot 5 to MPBC to provide for future expansion of the church. The structure was removed in 1963, and since then the lot has been used for parking and as a playground. Therefore, in the first forty years since the formation of the block, MPBC had acquired three of the twelve restricted lots, removed structures from two of them and built offices and classrooms on two of them.

In 1962, MPBC acquired Lot 13 and the Wilkes-Riley House subject to a life estate. Following termination of the life estate, MPBC demolished the house in 1980 and has used the lot since then as a vehicle turn-around for church activities and for recreational purposes.

In 1971, Queens College acquired Lot 7 and the Jones House. The lot has been used for parking since 1974. In 1989, MPBC acquired Lot 6 and the Pressley House. MPBC rented the house for residential purposes until 1994, when it was then used by MPBC to house its ministers until 1989. Thereafter it was vacant for one year until it was demolished by MPBC in 2000. In 1991, MPBC acquired Lot 4 and the Withers House. The property was leased to Queens College until 2000 for continuing education classes, conferences, receptions and private functions. MPBC agreed to sell the house to Queens College in 2000 and move the house to Lot 8, where it now stands.

In 1997, the Foundation acquired Lot 12 and the Archer House. It agreed to donate the lot to MPBC. The Foundation sold the house for one dollar. The house was moved off the property in 2000. Lot 12 has been vacant since then.

---

1. These lots contain other restrictive covenants not pertinent to this action. Therefore, we will refer to them as the "unrestricted lots."

In December 1998, petitioners purchased Lots 9 and 10 from Mr. Medearis's parents for $880,000. Petitioners moved in on 31 October 1999. In November 1999, the Foundation acquired Lot 11 and its structure, the Baldwin House, for $1.5 million. This house was demolished on 2 February 2000 to prevent MPBC from having to obtain a zoning variance to build the Cornwell Center. Therefore, in roughly eighty years since the completion of Block 37, MPBC acquired six of the twelve restricted lots, removed or demolished at least five structures, and built several buildings for the church complex. Two of the remaining six restricted lots belong to the Foundation, which moved a house from Lot 12 and demolished the house on Lot 11. Two of the remaining lots belong to Queens College and are used for parking, classes and social events. The remaining two restricted lots belong to petitioners, who use both lots for a single residence. *See* Illustration 3.

Petitioners filed an action for declaratory judgment on 3 August 2000 seeking to enforce the residential restrictions against MPBC, the Foundation and Queens College. MPBC and the Foundation filed a joint motion for summary judgment on 12 September 2000. Petitioners filed a notice of voluntary dismissal without prejudice as to Queens College on 18 September 2000, then filed a motion for summary judgment on 27 September 2000. A consent motion to join Queens College was filed on 29 September 2000. Queens College filed a motion for summary judgment on 13 October 2000. The trial court granted respondents' motions for summary judgment on 21 November 2000 and petitioners appealed.

## I. Summary Judgment

North Carolina courts have held that summary judgment is an appropriate procedure in an action for declaratory judgment. *Frank H. Connor Co. v. Spanish Inns Charlotte*, 294 N.C. 661, 242 S.E.2d 785 (1978); *Montgomery v. Hinton*, 45 N.C. App. 271, 262 S.E.2d 697 (1980). The Declaratory Judgment Act [Act] provides that orders, judgments and decrees under the Act "may be reviewed as other orders, judgments and decrees." N.C.G.S. § 1-258 (1999); *see also Nationwide Mutual Ins. Co. v. Allison*, 51 N.C. App. 654, 277 S.E.2d 473 (1981) (stating that the Act provides for the application of the same rules of review used in cases not brought under the Act). Therefore, on review of a declaratory judgment action, we apply the standards we would use when reviewing a trial court's denial of a motion for summary judgment.

Upon motion, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (1999). "An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972). An issue is genuine if it is supported by substantial evidence. *Id.* The moving party has the burden of proving that a genuine issue of material fact does not exist. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once the moving party "makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784-85, 534 S.E.2d 660, 664-65, *appeal dismissed and review denied by* 353 N.C. 262, 546 S.E.2d 401 (2000), *cert. denied*, 353 N.C. 371, 547 S.E.2d 810, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 261 (2001). The court must examine the moving party's evidence and resolve all inferences against the moving party. *Id.*

## II. Restrictive Covenants

Restrictive covenants are generally not favored by the courts; therefore, ambiguities will be construed in favor of the unrestricted use of the land. *Black Horse Run Prop. Owners Ass'n v. Kaleel*, 88 N.C. App. 83, 85, 362 S.E.2d 619, 621 (1987). However, "such covenants must be reasonably construed to give effect to the intention of the parties, and the rule of strict construction may not be used to defeat the plain and obvious purposes of a restriction." *Id.* (citing *Long v. Branham*, 271 N.C. 264, 156 S.E.2d 235 (1967)). When enforced, restrictive covenants will be enforced to the same extent as any valid contractual relationship. *Karner v. Roy White Flowers, Inc.*, 351 N.C. 433, 436, 527 S.E.2d 40, 42 (2000). Restrictive covenants may be enforced by and against any grantee " '[w]here the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement . . . .' " *Sedberry v. Parsons*, 232 N.C. 707, 710, 62 S.E.2d 88, 90 (1950). Restrictions under a general plan of development may be enforced against subsequent purchasers

of the land who take with notice of the restriction. *Id.* at 711, 62 S.E.2d at 91. The test for determining whether a general plan of development exists is whether substantially common restrictions apply to all similarly situated lots. *Id.*

Restrictive covenants may be terminated in several ways. Covenants may be terminated when they provide for their own termination. *See Tull v. Doctors Bldg., Inc.*, 255 N.C. 23, 120 S.E.2d 817 (1961). Covenants may also be terminated when changes within the covenanted area are "so radical as practically to destroy the essential objects and purposes of the agreement." *Id.* at 39, 120 S.E.2d at 828 (quoting *Rombauer v. Compton Heights Christian Church*, 40 S.W.2d 545, 553 (Mo. 1931)). Absent the termination of a restrictive covenant, the party against whom the covenant is sought to be enforced may still prevail on theories such as waiver, estoppel or laches. *See, e.g., Williams v. Paley*, 114 N.C. App. 571, 442 S.E.2d 558 (1994) (holding that intermittent violation of restrictive covenant did not waive plaintiff's right to enforce covenant); *Williamson v. Pope*, 60 N.C. App. 539, 299 S.E.2d 661 (1983) (holding that prior waiver of right to object to violation of restrictive covenant did not waive right to object to subsequent and more radical departure from permitted use); *Rodgerson v. Davis*, 27 N.C. App. 173, 218 S.E.2d 471 (1975) (holding that all parties waived their rights to enforce set-back restrictions by either violating restrictive covenant or failing to object to violations).

### III. Radical Change

We first address whether the covenant has been terminated. There is nothing in the record to indicate that the covenant has a termination provision. Therefore, we must examine whether the property underwent a radical change. Although Lots 1 and 14B are subject to restrictive covenants, they are not limited to residential uses. Therefore, we look solely at Lots 3 through 14A and conduct our review based on their use. *See* Illustration 4.

### A. Residential

Lots 9 and 10 are owned and occupied by the Medearis family and are being used for residential purposes. Therefore, they comply with the restrictive covenants.

### B. Parking

Lots 5, 7 and 8 are currently used for parking. Lot 5 has been used for parking since 1963. Lots 7 and 8 have been used for parking since

1974. Therefore, three of the twelve lots containing the residential restrictions in Block 37 are being used for parking. Although our courts have held that parking lots do not constitute such a radical change as to nullify the residential restrictive covenants, *Tull v. Doctors Bldg., Inc.*, 255 N.C. 23, 39-40, 120 S.E.2d 817, 828 (1961); *H. L. Mills v. HTL Enters.*, 36 N.C. App. 410, 418-19, 244 S.E.2d 469, 474-75 (1978), this is not always the case. Whether or not a radical change has taken place depends on the facts and circumstances of each case. *Karner v. Roy White Flowers, Inc.*, 351 N.C. 433, 437, 527 S.E.2d 40, 43 (2000).

Prior cases involving parking lots on restricted lots are distinguishable. In *H. L. Mills v. HTL Enters.*, 36 N.C. App. 410, 244 S.E.2d 469 (1978), for example, the defendant owned a fast food restaurant in a block with restricted and unrestricted lots. The restaurant was on an unrestricted lot. When the defendant attempted to build a parking lot on an adjacent restricted lot, the plaintiffs sought to enjoin the construction and uphold the restriction. This Court held that construction of the parking lot was not significant enough to destroy the restrictive covenant or to constitute waiver or estoppel. *Id.* at 417-18, 244 S.E.2d at 473-74. We find *H. L. Mills*, where only one lot was being used in violation of the restrictive covenant, to be distinguishable from the case at bar, where three lots are currently used for parking.

In *Tull v. Doctors Bldg., Inc.*, 255 N.C. 23, 120 S.E.2d 817 (1961), the plaintiffs owned property in three of eight blocks of Myers Park that were subject to residential restrictions. The plaintiffs brought an action to determine their rights, if any, to use their lots for non-residential purposes. The defendants were using seven restricted lots for office parking. There were approximately eighty-five lots containing the residential restriction. The trial court concluded that the defendants' use of the seven lots for parking was in violation of the residential restriction, but that the use was not so radical a change as to render the restrictive covenant unenforceable. *Id.* at 34, 120 S.E.2d at 824. This Court affirmed, holding that it would be inequitable to hold otherwise. In *Tull*, unlike this case, only a small percentage of restricted lots were being used for parking in violation of the restrictive covenant. As stated earlier, one quarter of the lots in Block 37 are currently used for parking. Based on the facts of the instant case, we find *H. L. Mills* and *Tull* distinguishable, and hold that parking *could*, under certain circumstances, constitute such a radical change as to destroy the restrictive

covenant. However, our analysis does not end here, as there are other lots to consider.

### C. Vehicle Turn-around

The Wilkes Riley House on Lot 13 was demolished by MPBC after the life tenant moved off the property around 1980. Since then, it has been used as a vehicle turn-around for church activities and for recreational purposes. The vehicle turn-around is substantially similar to the lots being used for parking; therefore, it is a factor which we will consider in determining the nature of the change in Block 37. Like the parking lots in *Tull*, the vehicle turn-around is a violation of the covenant restricting use of the lot to residential purposes.

### D. Offices and Classrooms

Lots 3 and 14A have been used openly and notoriously by MPBC for offices and classrooms since the mid-1950s and early 1960s. The parties stipulated that this use is in violation of the restrictive covenant. Therefore, these violations are also factors to consider in determining whether there has been such a radical change in Block 37 as to practically destroy the essential purpose of the covenant.

We note that in 1929, ten of the twelve restricted lots had residences. When MPBC acquired Lots 3 and 14A forty to forty-five years ago and began using the structures for offices, classrooms, etc., eight of the twelve restricted lots in Block 37 still had residences.

### E. Vacant Lots

Lot 4, the site of the Withers House when it was obtained by MPBC in 1991, was leased to Queens College for continuing education classes, conferences, receptions and private functions. The Withers House was recently moved from Lot 4 to Lot 8. Lot 4 is now vacant.

Lots 6, 11 and 12, which once contained structures that were residential in nature, are now vacant. Lot 6 was the site of the Pressley House when it was acquired by MPBC in 1989. The Pressley House was demolished in July 2000 to allow the Withers House to be moved from Lot 4 to Lot 8. Lot 11 was the site of the Baldwin House when the house and lot were purchased in November 1999 by the Foundation for $1.5 million. The Foundation demolished the Baldwin House in February 2000 to eliminate the need for a zoning variance to build the Cornwell Center. Lot 11 is now vacant. Lot 12 was the site of the Archer House when it was acquired by the Foundation in 1997.

The Foundation sold the house for one dollar in January 2000 to make room for the Cornwell Center. The purchaser moved the Archer House across the street and out of Block 37. Lot 12 is now vacant.

### F. Summary

In summary, Lots 5, 7 and 8 are currently used for parking, in violation of the restrictive covenant. Lot 13 is now used as a vehicle turn-around for church activities, in violation of the restrictive covenant. Lots 3 and 14A are currently used by MPBC as offices and classrooms in violation of the restrictive covenant. Lot 4, the site of a house used for almost ten years in violation of the restrictive covenant, is now vacant. Lots 6, 11 and 12 are now vacant after all residential structures were either demolished or moved to prepare for the building of the Cornwell Center. Therefore, at this point in our analysis, six of the twelve lots containing a residential restriction in Block 37 are in open and obvious violation of the restriction. Four other lots—4, 6, 11 and 12—previously used for residential purposes now stand vacant in preparation for building the Cornwell Center. As of the filing of this appeal Block 37 contained one residential structure. *See* Illustration 4.

### G. Radical Change

Based on our examination of the use of the lots in Block 37, we hold that the trial court did not err in granting summary judgment for respondents because the changes to Block 37 are "so radical as practically to destroy the essential objects and purposes of the agreement." *Tull*, 255 N.C. at 39, 120 S.E.2d at 828. We recognize that the residential restriction was put in place for the "protection and general welfare of the community." We also recognize that residential restrictions are generally a property right of distinct worth. *Id.* at 41, 120 S.E.2d at 829. However, in this case, the changes have destroyed "the uniformity of the plan and the equal protection of the restriction." *Starkey v. Gardner*, 194 N.C. 74, 79, 138 S.E. 408, 410 (1927). Therefore, summary judgment was appropriate.

Other cases have held that residential restrictions were terminated because of radical changes within the restricted areas. In *Muilenburg v. Blevins*, 242 N.C. 271, 87 S.E.2d 493 (1955), for example, the plaintiffs owned a lot with a residential restriction that was imposed in 1911 when the property was just outside the city limits of Charlotte. Forty-four years later, when the city had expanded beyond the plaintiffs' lot, the plaintiffs entered into an agreement to

sell the property. The buyer, the defendant, wanted to buy the property free and clear of all encumbrances to use for commercial purposes. The defendant refused to pay the plaintiffs when they delivered the deed because of the residential restriction. The plaintiffs brought an action for specific performance. The trial court declared the restriction void because the nature of the neighborhood had changed. The lot was surrounded by shopping areas, supermarkets, restaurants, offices, and gas stations. Our Supreme Court affirmed, finding ample evidence of a radical change that warranted the termination of the residential restriction. Similarly, in the case at bar, the nature of Block 37 has changed over eighty-five years such that the residential restriction must be deemed terminated.

In *Starkey v. Gardner*, 194 N.C. 74, 138 S.E. 408 (1927), the plaintiff and defendant owned lots developed under a common plan of development. The lots had covenants prohibiting the building of a " 'commercial or manufacturing establishment, or factory, or tenement, or apartment house, or house or building to be used as a sanatorium or hospital, or allow at any time any buildings erected thereon for any such purpose.' " *Id.* at 75, 138 S.E. at 408. The defendant wanted to erect a building in violation of the covenant, and the plaintiff sought an injunction. The trial judge found that restrictions had been terminated because more than eighty percent of the owners of lots in the subdivision had waived the restrictions by building businesses. *Id.* at 76, 138 S.E. at 408. The trial judge also found that the road adjoining the restricted property had developed into a major thoroughfare and was worth at least one hundred percent more than its value as residential property. *Id.* Our Supreme Court affirmed in a case of first impression.

## IV. Waiver

Even assuming that the trial court erred in granting summary judgment to respondents on the basis that the residential restriction terminated, we agree with the trial court that petitioners waived their right to enforce the restrictive covenant.

Waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466 (1938); *Clement v. Clement*, 230 N.C. 636, 639, 55 S.E.2d 459, 461 (1949). Almost any right may be waived, so long as the waiver is not illegal or contrary to public policy. *Clement v. Clement*, 230 N.C. 636, 639, 55 S.E.2d 459, 461 (1949).

Waiver is an affirmative defense. *Cantrell v. Woodhill Enters., Inc.*, 273 N.C. 490, 160 S.E.2d 476 (1968). Rule 8(c) of the North Carolina Rules of Civil Procedure requires that pleadings contain short, plain, statements of "any matter constituting an avoidance or affirmative defense sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved." N.C.G.S. § 1A-1, Rule 8(c) (1999); *see Cantrell*, 273 N.C. at 498, 160 S.E.2d at 482. Although waiver is a mixed question of law and fact, it is solely a question of law when the facts are not in dispute. *Gouldin v. Inter-Ocean Ins. Co.*, 248 N.C. 161, 166, 102 S.E.2d 846, 849 (1958).

In the case at bar, respondents raise waiver as a defense in their answers to petitioners' petition for declaratory judgment. We first determine whether respondents' pleadings meet the requirements of Rule 8(c). The Foundation's answer states,

> Petitioners and their predecessors in interest acquiesced to Myers Park Baptist Church . . . using numerous lots on Block 37, which were initially restricted to residential use only, for non-residential purposes. Petitioners and their predecessors in interest also have acquiesced to Queens College Inc.'s . . . use of Lots 7 and 8 for non-residential purposes.

Similarly, MPBC's answer states, "By allowing the extensive non-residential use of seven out of twelve lots in Block 37 over the years and by failing to otherwise exercise any right to enforce the restrictions . . . , the petitioners and their predecessors in title have waived any right to enforce any non-residential use . . . ." in Block 37. Finally, Queens College's answer states:

> Petitioners and their predecessors in interest have acquiesced to the Church's continuous, nonresidential use of residential-restricted lots for significant church buildings . . . . Likewise, Petitioners and their predecessors in interest have also acquiesced to the nonresidential use of residential-restricted lots owned by Queens College, Inc. . . . Based on the foregoing, Petitioners have waived any right to enforce the residential restrictions . . . .

We find these affirmative defenses sufficient to meet the pleading requirements of Rule 8(c).

A waiver may be express or implied. *See Turnage Co. v. Morton*, 240 N.C. 94, 81 S.E.2d 135 (1954). Neither the record nor the parties

indicate that petitioners expressly waived their right to enforce the residential restriction. Therefore, we determine whether there was an implied waiver by conduct.

A waiver is implied when a person dispenses with a right "by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right." *Guerry*, 234 N.C. at 648, 68 S.E.2d at 275. This Court previously ruled on a similar issue. In *Rodgerson v. Davis*, 27 N.C. App. 173, 218 S.E.2d 471 (1975), plaintiff landowners sought to enjoin defendants from building duplexes on lots containing several restrictive covenants, including a property line set-back provision and a prohibition against multi-unit family residences. While the restrictions were in place, plaintiffs built several dwellings in violation of the set-back provision, and defendants began constructing duplexes in violation of the set-back and single-family residence covenants. Plaintiffs sought an injunction to halt further construction and remove the duplexes. Defendants counterclaimed for an injunction requiring plaintiffs to comply with the set-back restriction. The other property owners were made parties to the action.

The trial court found that the restrictive covenants were valid. The court enjoined defendants from further construction and dismissed their actions because defendants had violated several covenants. *Id.* at 176, 218 S.E.2d at 473. Furthermore, the court found that plaintiffs would suffer undue hardship if required to conform to the set-back requirements because their structures were already complete. *Id.* Defendant appealed. Plaintiffs also appealed the trial court's refusal to enjoin defendants from using their incomplete structures because plaintiffs had also violated the covenants and the other property owners did not object to the violations. *Id.* at 177, 218 S.E.2d at 474.

This Court affirmed, holding that all of the parties waived their rights to enforce the set-back restrictions. The plaintiffs and defendants waived their rights to enforce the set-back provision because they, too, had violated the restriction. The other property owners waived their rights to enforce the restrictions by failing to object to the violations.[2]

---

2. Although the *Rodgerson* court did not expressly state that failure to object was the reason why the plaintiffs who were later joined waived their rights, the opinion states that the mandatory injunction against the defendants would be inequitable because "none of the additional party plaintiffs objected to any violations of the defendants or the original plaintiffs prior to having been made parties to this action."

The case at bar is analogous to *Rodgerson*. In this case, petitioners first learned of MPBC's plans to construct the Cornwell Center in June 1998 when they were invited as prospective homeowners to a meeting with the church. Petitioners purchased their house from Mr. Medearis's parents in December 1998. On 16 June 1999, Mr. Medearis sent a petition to neighbors requesting support to oppose a zoning variance needed by MPBC because it did not have enough land to meet the floor-to-area ratio needed to build the Cornwell Center. In the petition, Mr. Medearis stated that his understanding of the petition was that it would not stop the building; rather, it would only limit its size.

Petitioners moved into their residence on 31 October 1999. Thereafter, on 24 November 1999 the Foundation purchased Lot 11 and on 3 February 2000 demolished the Baldwin House to eliminate MPBC's need for a zoning variance. Mrs. Medearis testified that shortly after the demolition, she told the church congregation, "[M]y family did not oppose the building of the [Cornwell Center] and . . . we were prepared to go to the zoning hearing and tell them so."

The first time petitioners raised the issue of enforcing the residential restriction was on 18 May 2000. Prior to that time, petitioners did nothing to prevent MPBC from constructing the Cornwell Center; rather, they negotiated to reduce the size, orientation and placement of the building on MPBC property. Petitioners negotiated with MPBC repeatedly to redesign the plans for the Cornwell Center so that they would support a zoning variance. Notwithstanding the numerous negotiations, Mr. Medearis never requested that MPBC not build the Cornwell Center.

Consequently, in the year prior to petitioners' filing for declaratory judgment, the Foundation and MPBC incurred significant expenses preparing to build the Cornwell Center. The Foundation purchased Lot 11 containing the Baldwin House on 24 November 1999 for $1.5 million, then spent $16,195 to tear down the house. The Foundation also sold the Archer House on Lot 12 for $1, which was $252,579 less than the tax value. MPBC sold the Withers House to Queens College for $1.00 which was $392,229 less than the tax value. MPBC also pledged $100,000 to Queens College, which owns Lot 8, to move the Withers House in preparation for the construction of the Cornwell Center.

---

*Rodgerson*, 27 N.C. App. at 177, 218 S.E.2d at 474. Therefore, it is proper to infer this reason.

Based on the foregoing information, we hold that the trial court did not err in concluding that petitioners waived their rights to enforce the residential restrictions. Petitioners, by their conduct and statements, impliedly led respondents to believe that petitioners dispensed with their right to challenge the nonconformity. Furthermore, enforcing the restriction would impose an undue hardship on respondents because they incurred tremendous expenses before petitioners filed suit. Therefore, like the plaintiffs in *Rodgerson*, petitioners waived their rights to enforce the restriction.

## V. Conclusion

We hold that the trial court did not err in granting respondents' motion for summary judgment and declaring that the residential restrictions for Block 37 have been terminated because radical changes have practically destroyed the purpose of the restrictions. We also hold that, even if the restrictions were valid, petitioners waived their rights to enforce the restrictions. Accordingly, we affirm.

Affirmed.

Judges WYNN and McCULLOUGH concur.

**Illustration 1**