MYERS PARK HOMES COMPANY v. J. F. FALLS ET AL.

(Filed 29 November, 1922.)

**Deeds and Conveyances—Lands—Subdivisions—Maps—Plats—Streets—Lots—Limitation as to Size and Frontage—Purchasers—Equity—Contracts to Convey—Title.**

The plaintiff was a purchaser of a subdivision of land remaining undeveloped by the original owner, who had sold lots in his other subdivisions with restriction as to the size of the lots and their frontage upon the streets, each of the subdivisions being separate and distinct (*Stephens v. Home Co.*, 181 N. C., 335), without having adopted any definite plan or fixed purpose affecting the area or frontage of the lots in the subdivision acquired and being developed by the plaintiff, but had plats or maps made and recorded showing only a tentative or prospective plan of the sale of the entire property that were open to inspection by proposed purchasers. Having acquired the *locus in quo*, the plaintiff platted it into lots of smaller area and less frontage on the platted streets, and accordingly sold some of them, but the defendant refused to specifically perform his contract of purchase on the ground that the purchasers of lots of the other subdivisions, from the original owner, had acquired the right or equity of having the lots in this subdivision of the same size and frontage as the lots in the other subdivisions, in which they had purchased: *Held*, the equity relied on by the defendant did not apply to the facts of this case, and the defense that a good title could not be made by the plaintiff by reason of the limitations in the deeds to purchasers made by the original owner was untenable. Instances wherein lands have been platted into streets and lots, and sold upon the strength of representations made thereby, or covenants to that effect contained in the purchaser's deeds, have no application to the facts of this case.

APPEAL by defendants from *Webb, J.,* at October Term, 1922, of MECKLENBURG.

Controversy without action, submitted on an agreed statement of facts, the material parts of which are stated in the opinion.

From a judgment in favor of the plaintiff, the defendants appealed.

*John M. Robinson and C. H. Gover for plaintiff.*
*C. W. Tillett, Jr., for defendants.*

STACY, J. The following statement of the facts, taken from the case agreed, will suffice for our present decision:

On 1 April, 1922, defendants entered into a written contract whereby they agreed to purchase from the plaintiff a house and lot in a subdivision of Myers Park, a residential section near the city of Charlotte, N. C. Plaintiff executed and tendered deed, sufficient in form, to the defendants, who have refused to accept same, contending that the title to said property is defective. This suit is brought to compel specific performance. The *locus in quo* is known and designated as lot G in block 45, as shown on map or plat duly recorded in the office of the register of deeds for Mecklenburg County; said lot having a frontage of 75 feet and an area of a little more than a quarter of an acre. It is this small frontage and area that constitute the alleged defect in title.

Plaintiff acquired the property, in its present dimensions, from the Stephens Company, the original owners of the whole of Myers Park. It is the contention of the defendants that the Stephens Company could not convey the lot in question, or any other lot in Myers Park, to the plaintiff or other with a frontage of less than 100 feet and an area of less than one-half acre. In support of this position, it is alleged that the Stephens Company, before it sold the *locus in quo,* together with other lots, to the plaintiff, by its conduct and action *in pais* at least, had obligated itself not to convey lots in this subdivision in dimensions of less than 100 feet frontage and one-half acre in area.

Some twelve or thirteen years ago the Stephens Company became the owner of a tract of land near the city of Charlotte, containing approximately 1,100 acres. It undertook to develop this property into a desirable residential section, and gave to it the name of Myers Park. From time to time lots in various subdivisions of this property were placed on the market for sale after said subdivisions had been arranged and prepared for residential purposes, by the putting down of paved streets, installing gas, water, and sewer mains, providing for electric light connections, etc. We had occasion to consider the effect of the recordation and subsequent sale of lots by reference to maps of these

subdivisional plats in connection with the general map or "key map" in *Stephens Co. v. Homes Co.,* 181 N. C., 335. Reference to that case may aid, in a measure, to a better understanding of the facts here.

The Stephens Company advertised that it was developing Myers Park as a desirable residential suburb, and at the very beginning worked out a series of restrictions and limitations, which were incorporated in some but not all of the deeds executed by it in conveying lots sold in this territory. These restrictions, thirteen in number, are set out in full in the record but the ones more directly pertinent to the present appeal are the 8th and 13th, as follows:

"(8) No subdivision of any part of the above described property by sale, or otherwise, shall be made so as to result in a plat having an area of less than half an acre or a frontage of less than one hundred (100) feet."

"(13) It is expressly understood and agreed by the parties hereto that all of the foregoing covenants, conditions, and restrictions, which are for the protection and general welfare of the community, shall be covenants running with the land."

While the Stephens Company has held out and advertised itself as offering for sale high-class, restricted residential property, it has never advertised lots in Myers Park as being limited to those having an area of at least one-half acre or a frontage of at least 100 feet. Nor has it, by advertisement or representation, indicated or intimated that all or any part of its property would be sold only upon the terms set forth in restriction No. 8.

In the course of time the development of Myers Park reached the vicinity of the subdivision with which we are now concerned, and the Stephens Company had a plat prepared and recorded showing this subdivision as block 45; and, upon the map, said block was shown as being divided into lots of not less than one-half acre in area, and each with a frontage of not less than 100 feet. A number of lots were sold according to this plat and thereafter a revised plat was made and recorded showing all unsold portions of this subdivision, or block 45, to be subdivided into lots of about one quarter of an acre in area and each with a frontage of approximately 75 feet. After this revised plat had been recorded, the *locus in quo,* with a number of other lots, was conveyed by the Stephens Company to the plaintiff.

No written instrument, memorandum, or note has ever been executed by the Stephens Company, the plaintiff's grantor, or by any person in its name, expressly granting to the purchasers of lots previously conveyed, or other, any easement in the nature of the alleged restriction upon the land retained by it, of which the *locus in quo* constituted a part. Nor has it entered into any express covenant to hold the re-

mainder of its said tract subject to the restriction that no part thereof should be sold in lots of less than one-half acre in area, and each with a frontage of not less than 100 feet. No agreement has been made by it to exact such a covenant from future purchasers of any of the remaining lots in this development.

The only covenant in writing expressly affecting and referring to the lot in question, executed either by the Stephens Company or by the plaintiff, or by any agent lawfully authorized by either, is the covenant contained in the deed from the Stephens Company to the plaintiff, namely, "No subdivision of any part of the above described property, by sale or otherwise, shall be made." At the time this recital was incorporated in the deed, the dimensions of said lot were, as stated above, about one-quarter of an acre in area and with a frontage of approximately 75 feet.

For the purpose of satisfying the defendants, the plaintiff has procured from all owners of lots shown upon the subdivisional plat, upon which the lot in controversy appears, duly executed and acknowledged releases, waiving any and all rights which they may have to enforce said restriction and consenting that the Stephens Company shall sell lots in said subdivision of less than one-half acre in area and each with a frontage of less than 100 feet.

Notwithstanding these releases, the defendants refuse to accept the deed tendered, contending that the alleged restriction upon the *locus in quo* cannot be released except by the owners of all lots in all subdivisions in Myers Park. Though it is admitted by the defendants that Myers Park has been developed and tracts offered for sale in sections or subdivisions, as hereinbefore set forth, yet they contend that these component tracts or subdivisions constitute one single development, or a unity, and that owners of lots in other subdivisions have as much right to enforce the alleged implied restriction as those who own lots in block 45.

It is agreed that the Stephens Company has at no time actually or intentionally adopted any policy, plan, or scheme to sell all of its said property, or all of the lots in any subdivision thereof, in lots of not less than one-half acre in area or each with a frontage of not less than 100 feet. And it is further agreed that unless the recording of the said subdivisional plats, and the sales by reference thereto, amount, as a matter of law, to the adoption of such a plan of development, it has done no act which could be construed as adopting any definite or fixed plan with respect to the area or frontage of lots thereafter to be sold. On the contrary, it is conceded that it has always been the actual intention and plan of the Stephens Company to sell, in such localities as it might deem advisable, smaller lots than those provided for under the restric-

tion in controversy, and for said purpose to alter and to revise its said subdivisional plats, and it has, in fact, in a number of instances, altered and revised the same.

It is further agreed that at various times the Stephens Company has caused to be made maps of the entire territory within Myers Park, showing the developed portions thereof in accordance with the recorded subdivisional plats, and that it has also prepared tentative plans for the future development of other subdivisions; but that said maps were made and used solely for tentative purposes, and to give an idea of the general plan of the development. While these general plans were accessible in the office of the Stephens Company to purchasers, and may have been seen by many, yet in all conveyances all property sold within Myers Park has been described solely with reference to the recorded subdivisional plats. As stated, however, a number of these general plans had been prepared from time to time. Most of them disclosed neither the area nor frontage of lots, but one or more did show the dimensions of the proposed lots.

Upon these, the facts chiefly relevant, the defendants contend that the title offered is defective in that the lot in question is less than one-half acre in area and has a frontage of less than 100 feet; said dimensions being at variance with the negative restriction contained in some of the deeds executed by the Stephens Company to other purchasers of lots in Myers Park. Does such restriction apply to the *locus in quo,* under the facts and circumstances here disclosed? This is the question for decision.

It may be noted in the outset that the principles announced in *Conrad v. Land Co.,* 126 N. C., 776; *Collins v. Land Co.,* 128 N. C., 563; *Green v. Miller,* 161 N. C., 25; *Wheeler v. Construction Co.,* 170 N. C., 427; *Elizabeth City v. Commander,* 176 N. C., 26; *Wittson v. Dowling,* 179 N. C., 542, and other cases to like import, dealing with the dedication of streets, parks, and alleys for public uses, are not controlling here. Apparently for the first time in this jurisdiction the question is presented in its relation to a negative restriction affecting the size and dimensions of certain designated lots in a given territory.

The following general statement, which the defendants contend is applicable to the facts in hand, will be found in 18 C. J., 394: "Where the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions upon its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee, either upon the theory that there is a mutuality of covenant and consideration or upon the ground that mutual negative equitable easements are created. Where parcels are sold with reference to such a uniform plan to persons

having notice thereof, the grantees may enforce the restrictions within this rule irrespective of the order of the several conveyances, and irrespective of whether the covenants run with the land, and without regard to whether the restriction is expressed in the separate conveyances, or whether the person against whom it is sought to enforce the restriction derived title from the same grantor."

Probably one of the best considered opinions on the subject, in which a number of English and American decisions are carefully reviewed, is *DeGray v. Monmouth Beach Club House,* 24 Atl. (N. J.), 388. In this case the doctrine is summarized as follows: "The law, deducible from these principles and the authorities applicable to this case, is that where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development and improvement of the property, by which it is divided into streets, avenues, and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser; and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof; and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan—one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme, and the covenant has been part of the subject-matter of his purchase. The right of action from this would seem to be dependent as much on the fact of the general scheme as on the covenant—a very important consideration in a case in which the question arises whether certain threatened acts are in violation of the covenant, if any ambiguity exists as to its scope and meaning."

It may be well to observe just here that the defendants are not undertaking as grantees to enforce a restrictive covenant, contained in their deed, against another grantee whose deed from a common source contains the same restrictive provision.

The defendants rely chiefly upon the decision in *Johnson v. Mt. Baker Park Presbyterian Church,* 194 Pac. (Wash.), 536. The controlling facts in this case were as follows: A development company platted a suburban tract of land near Seattle, Wash., and put it on the market with the intention of limiting the use of the various lots to first-class residential purposes. This plan or scheme was made known to the public, was systematically carried out, and was well understood by all purchasers of lots in "Mt. Baker Park." When more than three-fourths of the lots in said development had been sold—the deeds of all purchasers containing certain building restrictions—the development company undertook to sell one of the remaining lots to the Presbyterian

Church without placing any restrictions in its deed. The plaintiff, who had bought subject to the general restrictions, brought an action to enjoin the erection of the church on the lot purchased by the defendant, upon the ground that all the lots in said development were impliedly subject to the general restriction for residential purposes. The Court held that the general plan could be invoked by the plaintiff, and that the lot sold to the defendant could not be used for church purposes.

To like effect is the decision in *Brimson v. Bultman,* 38 N. Y. Supp., 209, where it was said: "The principle which supports the judgment in this action is that where an owner of land contracts with the purchasers of successive parcels in respect to the manner of the occupation and improvement of such parcels, he thereby affects the remainder of the land with an equity which requires it also to be occupied and improved in conformity to the general plan, and this equity is binding upon a subsequent purchaser of the remaining parcel, who has notice of the prior agreement, although his title be unrestricted."

Again, defendants cite *McQuade v. Wilcox,* 183 N. W. (Mich.), 771, as a persuasive authority in support of their position. This was a case where Mrs. Wilcox, the owner of a valuable farm near the city of Detroit, conceived the idea of platting a portion of it for a high-class residential subdivision. The plat was prepared and recorded. Its residential and restricted character was made the subject of advertisement, and pointed out in conversation as an inducement to prospective customers. A general plan was adopted to make it a high-class restricted residential district. To insure and to preserve the residential character of the subdivision, substantially uniform restrictions were inserted in the deeds executed by Mrs. Wilcox to the purchasers. One of the restrictions contained in each deed was to the effect that the lot thereby conveyed should be used only for residential purposes, and then followed this clause: "These conditions are for the benefit of all present and future owners of property in this subdivision, and are to remain in force until 1 July, 1935, and shall then terminate." Mrs. Wilcox reserved the home place for her own residence. She occupied this residence for a number of years, and after all but a few of the lots in the subdivision had been sold and expensive residences erected thereon, and other improvements made upon them in conformity with the restrictions and without a breach by any of the purchasers or other grantees, Mrs. Wilcox entered into a contract with one Ben. B. Jacob to sell him her home place, to be used for restaurant and cafe purposes, with this clause in the contract: "Music, dancing, and other legal amusements and uses are permitted." The plaintiff McQuade had bought a lot in this subdivision and had built a house upon it. He sought to enjoin the defendant from selling and authorizing the use of her residence for the cafe

purposes above mentioned. Mrs. Wilcox contended that no restriction had ever been placed upon her home property, and that, therefore, she was not bound by this alleged general plan. The Court held, however, that in view of all the circumstances it would consider McQuade and the other property owners in the subdivision as entitled to an equitable right to prevent Mrs. Wilcox's lot from being sold for the said cafe purposes, and the injunction was granted.

The following authorities are also cited by the defendants as supporting, either directly or in tendency, their view of the law: *Allen v. Detroit,* 133 N. W. (Mich.), 317; *Hancock v. Gumm,* 107 S. E. (Ga.), 872; *Tallmadge v. East River Bank,* 26 N. Y., 105; *Knapp v. Hall,* 20 N. Y. Supp., 42; *Duester v. Alvin,* 145 Pac. (Or.), 660; *Lowrence v. Woods,* 118 S. W. (Tex.), 551; *Bridgewater v. Ocean City R. Co.,* 49 Atl. (N. J.), 801; *Scott v. Roman Catholic Archbishop,* 163 Pac. (Or.), 88; *Hisey v. Eastminster Pres. Church,* 109 S. W. (Mo.), 60; *Stott v. Avery,* 121 N. W. (Mich:), 825; *Bostwick v. Leach,* 3 Day (Conn.), 476.

It will be noted that the controlling factor or basic principle in all of the cases cited above is the adoption or establishment, either directly or by implication, of a general plan or scheme, to be observed uniformly for the benefit of all purchasers throughout the entire territory. But, in the case at bar, we have it expressly admitted that the Stephens Company has at no time adopted any definite plan or fixed purpose with respect to the area or frontage of all the lots in Myers Park, unless the recordation of the subdivisional plats, as above set out, and the sale of lots thereby amount, as a matter of law, to the adoption of such a general plan or scheme. It is further admitted of record that the plaintiff has secured from all owners of lots, in the particular subdivision containing the *locus in quo,* duly executed and acknowledged releases, waiving all their rights, if any they have, to insist upon the alleged implied restriction, and consenting to the sale by the Stephens Company of the lot in controversy as well as other lots similarly situated.

Notwithstanding these releases, the defendants contend that all the subdivisions of Myers Park are but component parts of a single development, and, therefore, should be considered as constituting but one entire whole or unity. We had occasion to deal with this question in *Stephens Co. v. Homes Co.,* 181 N. C., 335, where it was held that each of these subdivisions was designed to be, and was in fact a separate, distinct, and integral subdivision.

While these admissions would seem to take the case at bar out of the principles announced in the decisions above considered, and upon which the defendants rely, it may be well to examine some of the cases holding a contrary view.

28—184

In *Bondurant v. Paducah & I. Ry. Co.,* 218 S. W. (Ky.), 257, the facts were that the West End Improvement Company, the owner of a large tract of land near Paducah, Ky., had platted the same into lots and streets. Lots were sold to the plaintiff and others by deeds containing a restriction providing, among other things, that the property conveyed should not "in any way become a nuisance to adjacent residents or damaging to adjacent property." The plaintiff alleged that in selling lots under such plat the West End Improvement Company had "adopted and used as a common system of regulation and improvement for residence-section purposes a series of covenant restrictions and conditions for the private benefit of each and all lots sold, as well as of each and all of the lots and lands therein still owned by such company." It did not appear that the deeds to the lots upon which the defendant had constructed its railroad contained any such provision as was contained in the deed to the lot of the plaintiff. In holding that a custom or system of restrictions could not form the basis of any action by one purchaser of lots against another to subject the property of the latter to such restrictions, where the deed to the latter contained none, the Court disposed of the proposition in the following manner:

"Whatever may have been the custom or system of restrictions and conditions adopted by West End Improvement Company in selling lots cannot form a basis for an action against a subsequent owner of one or more of the lots in such addition, in the absence of an allegation and proof that such conditions were embodied in the conveyance under which the defendants hold title. The mere fact that the deed from the West End Improvement Company to Flournoy, under which appellant holds title, contains a restriction as to use of the lots thereby conveyed, could in no wise be binding upon others acquiring lots within such addition, unless there was embodied in the deeds under which they hold title a similar restriction. It will be noticed, too, that it is not alleged that the West End Improvement Company made any agreement, or embodied in other conveyances, that it might make similar restrictions, but only that such was its custom.

"It therefore seems clear to us that neither the petition nor the proof was sufficient to justify a recovery from appellee for a violation of any covenant restrictions, since neither the restrictions in appellant's deed nor any other restrictions were alleged or proven to have been contained in any deed in appellee's chain of title to the lots upon which it constructed its railroad, or to have been binding in any way upon appellee."

In *Farquharson v. Scoble,* 177 Pac. (Cal.), 310, a suit was instituted in equity to enforce certain alleged building covenants, claimed to be provided for under a general building plan designed by the defendant, John Brickell Company, for the improvement, subdivision, and sale

of a certain tract of land situated in the city and county of San Francisco, fronting on the Golden Gate and known as Seacliff. The facts are succinctly stated in the opinion as follows:

"The substance of the allegations necessary for a discussion of the case is, first, that the Brickell Company adopted in the subdivision of the tract of land above referred to what courts have called a 'general building plan,' under which the parcels subdivided were to be used for high-class restricted residences. The complaint then alleges that in the formation of such plan an elaborate and detailed map was prepared by defendant showing the subdivision of the tract into lots, and that sales were made to plaintiff and others in accordance therewith and under the representation that all the subdivisions would be disposed of in conformity with such map and subject to certain restrictive building covenants designed for the development of the tract as a whole and for the benefit of every purchaser in particular. It further alleges that the defendant John Brickell Company had sold to the defendant Thomas Scoble parcels of land contiguous to the lots owned by plaintiff not in accordance with the subdivision as contained on the map under which it had represented the land would be sold, and subject to restrictive building covenants relating to the location of residence building with respect to side-line boundaries less onerous than those imposed on the adjoining property of plaintiff."

In sustaining the demurrer to the complaint, filed on the ground that no cause of action had been stated, and in holding that no implied covenant could be asserted against the land of the defendant, the Court's conclusions were thus in part expressed:

"In our opinion, the covenant here claimed cannot be implied from the mere making and filing of the map showing the different subdivisions, or by selling lots in conformity therewith. The right of an owner in such a case to dispose of the unsold portions of his lots singly or in bulk, or by subdivision into smaller parcels, is in no manner limited or impaired thereby. *Herold v. Real Est. Co.,* 72 N. J. Eq., 857; 67 Atl., 608; 14 L. R. A. (N. S.), 1067; 129 Am. St. Rep., 718; 16 Ann. Cas., 580. Of course, limiting and restrictive covenants, when valid, will be enforced; but when claimed courts will construe them strictly against the person seeking their enforcement, and when none are contemplated, they will not be created. In their absence a vendee cannot be held to a restrictive use of his property."

With reference to the second proposition considered by the Court, namely, whether the sale by the Brickell Company to the defendant Scoble could be restrained on account of the proposed deed containing restrictive building covenants less onerous or burdensome than those

.imposed on other lots in the tract similarly located, the opinion of the Court continues:

"Plaintiff claims that they should be in conformity with those established in his deeds. But even as to those, no uniformity is shown to exist, for the dimensions as to the easterly and westerly boundaries are not uniform. That no general scheme or plan in this particular was ever contemplated is further indicated by other pleaded facts. None are contained in the printed form of deed adopted by the company. In that instrument the provisions as to the dimensions of the side-line restrictions are left blank, presumably to be filled in when fixed and determined by the company when selling a particular lot. In addition thereto, it affirmatively appears by the allegations in the complaint that the side-line distances, even when established and adopted, were subject to change by agreement of contiguous or abutting owners. Under such circumstances the side-line restrictions could be entirely done away with. How, then, can it be said that such restrictions were in accordance with any general plan? We conclude there was none.

"From what we have said we are of the opinion that the sale by the company of the lots to Scoble was not destructive of, or violative of, or inconsistent with, any general building plan adopted by the company."

It is to be noted here the Court based its conclusion that no general plan had been established upon the facts that no uniformity in the previous covenants had been shown to exist, since no general scheme or plan was contained in the form of deed adopted by the company and certain portions thereof were left blank, and since the side-line distances were subject to change by agreement of contiguous or abutting owners. In the case at bar, we have it conceded that no uniformity has been practiced by the Stephens Company in regard to the alleged restriction, touching the size and frontage of lots.

In *Herold v. Columbia Investment & Real Estate Co.,* 72 N. J. Eq., 857, it was held that the platting of a tract of land into streets and lots of a certain size and the sale of lots according to the plat did not perforce imply a covenant that the size of the remaining lots should not be changed, but that it was otherwise as to the streets. The essential facts were as follows: The owner of a tract of land, which it had laid out into certain lots and streets delineated upon a map of the property prepared under its direction and filed for recordation, sold some of the lots shown on the map to the complainant and others. Later another map was made and filed, upon which many of the lots delineated upon the original map, under which the complainant purchased, were divided into smaller parcels. In addition, an alteration was made in the location and character of certain streets shown on the original map.

The complainant insisted that these changes from the plan exhibited by the original map, if carried into effect, would materially interfere

with his enjoyment of his property, the reduction in the size of the lots by causing the erection thereon of buildings of small sizes and little value, and the alteration of the streets by destroying the quietude of his residence. All of this, he contended, would depreciate the value of his property. For these reasons, he sought to restrain the defendants from altering the streets and from selling any of the land contained in the tract, except by the lots as shown upon the original map. The complainant further sought to restrain the defendant from violating a so-called "neighborhood scheme," which he alleged had been put in force and become operative throughout the whole tract delineated upon the map, and by the provisions of which but one building was permitted to be erected upon a single lot, and was required to be located at a given distance from the front, rear, and side-lines thereof.

The Court held that the proof failed to show the existence of any alleged "neighborhood scheme," and that it was, therefore, unnecessary to consider the question of whether the purchaser had a remedy in equity against the vendor, or to restrain him from selling the remainder of his lots free from such restrictions.

As to the question with reference to the map, the Court said: "No such covenant is implied by the making of such a map and the sale of certain of the lots shown thereon; and the right of the owner to dispose of the unsold portion of his lots singly or in bulk, or by subdividing them into smaller parcels, and selling them in such parcels, is complete."

In regard to the attempt to alter and to narrow certain of the streets, delineated upon the original map, it was held that this was clearly an infringement of the rights of complainant, since it was reasonable to infer that the streets as shown induced the purchaser to buy portions of the tract laid out on the plan, and further, to imply a covenant that the streets should remain open, as appears from the following extract of the opinion: "The object of the principle is not to create public rights, but to secure to persons purchasing lots under such circumstances those benefits the promise of which it is reasonable to infer has induced them to buy portions of a tract laid out on the plan indicated."

To similar or like effect are the following decisions: *Werner v. Graham,* 183 Pac. (Col.), 945; *Sprague v. Kimball,* 100 N. E. (Mass.), 622; *Ham v. Massasoit Real Estate Co.,* 107 Atl. (R. I.), 205; *Rice v. Roberts,* 24 Wis., 461; *Newton v. City of Dunkirk,* 106 N. Y. Supp., 125; *McCusker v. Goode,* 185 Mass., 607.

In the instant case, it appearing (1) that no general plan or uniform scheme has been adopted by the Stephens Company, which should be held to affect the entire development known as Myers Park, and (2) that releases have been secured from all owners of lots in block 45, the particular subdivision containing the *locus in quo,* we must conclude

that the title offered is valid and the plaintiff is entitled to a decree of specific performance. This was the holding of the court below, and we affirm the judgment.

This disposition of the case renders it unnecessary for us to consider, at this time, the remaining exceptions relating to the statute of frauds.

Affirmed.