584 S.E.2d 731 (2003)
357 N.C. 396
William J. WISE and Lynn P. Wise
v.
HARRINGTON GROVE COMMUNITY ASSOCIATION, INC., and Tom Fitzgerald, Tamara James, Dave Becherer, Stewart Joslin, Bill Schultz, and Mike Dalton, in their official capacities as members of the Harrington Grove Community Association Board of Directors.
No. 428A02.
Supreme Court of North Carolina.
August 22, 2003.
*733 Hunton & Williams, by William D. Dannelly and Julie Beddingfield, Raleigh, for plaintiff-appellants.
Jordan Price Wall Gray Jones & Carlton, by Henry W. Jones, Jr.; Hope Derby Carmichael; and Brian S. Edlin, Raleigh, for defendant-appellees.
MARTIN, Justice.
This is a declaratory judgment action brought by real property owners against their homeowners association. The facts, as reflected in the record on appeal, are as follows: In 1999, William and Lynn Wise (plaintiffs) purchased a home in the Harrington Grove subdivision in Raleigh, North Carolina. Plaintiffs' home, as well as every other home in Harrington Grove, is subject to the "Declaration of Covenants, Conditions and Restrictions of the Harrington Grove Homeowner's Association, Inc." (the declaration), recorded with the Wake County Register of Deeds in May 1987.
The declaration provides that plaintiffs, and all others owning real property in Harrington Grove, automatically become voting and assessment-paying members of the Harrington Grove Community Association, Inc. (defendant), a nonprofit North Carolina corporation. The declaration assigns defendant various powers and obligations concerning enforcement of the covenants in the declaration, upkeep of the common areas, and maintenance of the subdivision's aesthetic appeal. Defendant's articles of incorporation allow it to exercise "all of the powers and privileges and perform all duties and obligations of the Association as set forth in the Declaration." In turn, defendant's bylaws vest all powers granted to it under the declaration in a board of directors. The bylaws also provide for the *734 creation of an architectural control committee (ACC).
From time to time, defendant's board has adopted and published "Architectural Standards & Construction Specifications." The ACC uses these standards to evaluate whether proposed construction projects will obtain official ACC approval. The architectural standards in effect when the present action arose purport to authorize the imposition of monetary fines on association members for violations of the architectural standards. These standards were approved by defendant's board but have never been added to the declaration pursuant to its formal amendment procedure and have never been recorded. As discussed more fully below, no provision of the declaration, the articles of incorporation, or the bylaws expressly provides for the imposition of fines on association members.
Shortly before closing on the purchase of their home, plaintiffs obtained the ACC's approval for construction of an in-ground swimming pool on their lot. Plaintiffs began pool construction approximately one week after closing. During construction, plaintiffs installed a retaining wall varying in height from eleven to twenty-seven inches. After learning of the retaining wall, the ACC revoked its earlier approval and retroactively denied plaintiffs' request for approval of the pool construction as to the retaining wall. By letter dated 13 May 1999, defendant alerted plaintiffs that the ACC had proposed the levying of a fine against plaintiffs for violation of the covenants found in the declaration. On 7 July 1999, defendant's board met to consider the fine and heard presentations from plaintiffs and the ACC. After the board meeting, defendant asserted that the wall was constructed without the required ACC approval and imposed a fine.
Plaintiffs filed the present action seeking, in relevant part, a declaratory judgment that defendant's attempt to levy a fine against plaintiff was ultra vires and void. On 2 April 2001, the trial court denied plaintiff's motion for partial summary judgment as to the declaratory judgment action, and declared that defendant was authorized to levy a fine against plaintiffs. The Court of Appeals affirmed the trial court's ruling, holding that a power to impose fines under N.C.G.S. § 47F-3-102(12) is automatically and retroactively granted to homeowners associations created prior to 1 January 1999 unless an association's declarations or articles of incorporation expressly provide otherwise. Wise v. Harrington Grove Cmty. Ass'n, 151 N.C.App. 344, 353, 566 S.E.2d 499, 503 (2002). Since the declaration does not expressly discuss a power to impose fines, the Court of Appeals held that defendant possessed such a power solely by virtue of the statute. Id.
In dissent, Judge Wynn observed that N.C.G.S. § 47F-3-102 provides that the enumerated powers are retroactively provided to a homeowners association "subject to" an association's declaration and articles of incorporation. Id. at 354-55, 566 S.E.2d at 505 (Wynn, J., dissenting). Because the declaration only mentioned a lawsuit for damages or injunctive relief as defendant's remedy for a covenant violation, Judge Wynn concluded that defendant lacked legal authority to impose a fine on plaintiffs. Id. Plaintiffs appeal based upon this dissent. N.C.G.S. § 7A-30(2) (2001).
The question presented to this Court is whether the North Carolina Planned Community Act (the PCA or the Act) retroactively authorizes defendant to fine plaintiffs for violations of restrictive covenants in the declaration despite the lack of express authorization in the declaration itself, in defendant's articles of incorporation, or in the corresponding bylaws (collectively referred to as "organizational documents"). We hold that the PCA does not automatically grant defendant such a power, and we therefore reverse.

I.
In 1998, the General Assembly enacted the PCA, a series of statutes regulating the creation, alteration, termination, and management of planned subdivision communities. See generally Act of Oct. 15,1998, ch. 199, 1998 N.C. Sess. Laws 674 (codified as amended at N.C.G.S. ch. 47F). As codified at the time plaintiffs initiated the present *735 action,[1] the PCA purports to apply, with some exceptions not relevant to the instant case, to "all planned communities" in North Carolina. N.C.G.S. § 47F-1-102(a),(b) (2001). Harrington Grove meets the statutory definition of a "planned community" because property owners in Harrington Grove, by virtue of their ownership of a lot, are obligated to pay monies to defendant for the maintenance of certain real estate that is described in the declaration, other than their own lots. See N.C.G.S. § 47F-1-103(23) (2001). The PCA provides that all planned communities must incorporate an "association" consisting of everyone owning lots located in the planned community. N.C.G.S. § 47F-3-101 (2001). The PCA then grants a series of powers to those associations pursuant to N.C.G.S. § 47F-3-102.
According to the commentary to the PCA, however, the Act does not apply in its entirety to planned communities created prior to 1 January 1999:
The Act is effective January 1, 1999 and applies in its entirety to all planned communities created on or after that date.... G.S. 47F-3-102 (1) through (6) and (11) through (17), G.S. 47F-3-107(a), (b) and (c), G.S. 47F-3-115 and G.S. 47F-3-116 also apply to planned communities created prior to January 1,1999.
N.C.G.S. § 47F-1-102, N.C. cmt. (2001).[2] The PCA therefore has limited applicability to the Harrington Grove subdivision, a planned community created in 1987. Among the statutory provisions the PCA purports to apply to older planned communities like Harrington Grove is N.C.G.S. § 47F-3-102(12), the provision cited by the courts below as providing defendant legal authorization to impose a fine on plaintiffs.
At the outset, we note that retroactive application of the PCA potentially disturbs the common law rights of persons owning property in a planned community created prior to the PCA's enactment. This Court has long acknowledged and discussed the creation of subdivisions and the enforcement of common plans of development. See, e.g., Karner v. Roy White Flowers, Inc., 351 N.C. 433, 436-37, 527 S.E.2d 40, 42-43 (2000); Hawthorne v. Realty Syndicate, Inc., 300 N.C. 660, 665, 268 S.E.2d 494, 497 (1980); Sedberry v. Parsons, 232 N.C. 707, 710-11, 62 S.E.2d 88, 90 (1950); Myers Park Homes Co. v. Falls, 184 N.C. 426, 430-31, 115 S.E. 184, 186 (1922). Prior to enactment of the PCA, the creation and enforcement of residential development plans similar to Harrington Grove were largely accomplished through the use of common law restrictive real estate covenants.[3]See, e.g., Karner, 351 N.C. at 436-37, 527 S.E.2d at 42-43; East Side Builders, Inc. v. Brown, 234 N.C. 517, 522, 67 S.E.2d 489, 492 (1951).
As a general rule, "[r]estrictive covenants are valid so long as they do not impair the enjoyment of the estate and are not contrary to the public interest." Karner, 351 N.C. at 436, 527 S.E.2d at 42; cf. Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (describing freedom of contract generally). Restrictive covenants are "legitimate tools" of developers so long as they are "clearly and narrowly drawn." J.T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc., 302 N.C. 64, 71, 274 S.E.2d 174, 179 (1981). The original parties to a restrictive covenant may structure the covenants, and any corresponding enforcement mechanism, in virtually any fashion they see fit. See Runyon v. Paley, 331 N.C. 293, 299, 416 S.E.2d 177, *736 182 (1992) ("an owner of land in fee has a right to sell his land subject to any restrictions he may see fit to impose"). A court will generally enforce such covenants "`to the same extent that it would lend judicial sanction to any other valid contractual relationship.'" Karner, 351 N.C. at 436, 527 S.E.2d at 42 (quoting Sheets v. Dillon, 221 N.C. 426, 431, 20 S.E.2d 344, 347 (1942)). As with any contract, when interpreting a restrictive covenant, "the fundamental rule is that the intention of the parties governs." Long v. Branham, 271 N.C. 264, 268, 156 S.E.2d 235, 238 (1967). Therefore, under the common law, developers and lot purchasers were free to create almost any permutation of homeowners association the parties desired. Not only could the restrictive covenants themselves be structured as the parties saw fit, a homeowners association enforcing those covenants could conceivably have a wide variety of enforcement tools at its disposal.
"Statutes in derogation of the common law ... should be strictly construed." Stone v. N.C. Dep't of Labor, 347 N.C. 473, 479, 495 S.E.2d 711, 715, cert. denied, 525 U.S. 1016, 119 S.Ct. 540, 142 L.Ed.2d 449 (1998). This is particularly true where a statute is "penal in nature," Elliott v. N.C. Psychology Bd., 348 N.C. 230, 235, 498 S.E.2d 616, 619 (1998), or where the statute "infringe[s] upon the common law property rights of others," Turlington v. McLeod, 323 N.C. 591, 594, 374 S.E.2d 394, 397 (1988). A fine is commonly defined as a "pecuniary punishment" or a "penalty." Black's Law Dictionary 759 (4th ed. 1968). Any statute authorizing imposition of a monetary fine is, therefore, necessarily punitive or penal in nature. Moreover, any fine upheld on the facts of the present case directly implicates plaintiffs' right to use their property as they choose. "Every person owning property has the right to make any lawful use of it he sees fit, and restrictions sought to be imposed on that right must be carefully examined...." Vance S. Harrington & Co. v. Renner, 236 N.C. 321, 324, 72 S.E.2d 838, 840 (1952).
It is with these considerations in mind that we turn to the text of the relevant statute.
Subject to the provisions of the articles of incorporation or the declaration and the declarant's rights therein, the association may:
....
(12) After notice and an opportunity to be heard, impose reasonable fines or suspend privileges or services provided by the association (except rights of access to lots) for reasonable periods for violations of the declaration, bylaws, and rules and regulations of the association[.]
N.C.G.S. § 47F-3-102(12).
Defendant essentially argues that this statute abolishes homeowners associations created by contract in favor of uniform, statutorily created homeowners associations. Defendant insists that even when the original restrictive covenants are silent on the matter, and even when there is no evidence of any intent to create the powers listed in N.C.G.S. § 47F-3-102, the commentary to N.C.G.S. § 47F-1-102 grants all homeowners associations created prior to 1999 a variety of sweeping new powers listed in N.C.G.S. § 47F-3-102, including the power to financially penalize association members for violations of the restrictive covenants. This proposed interpretation would drastically alter the common law rules respecting the rights and intentions of parties to a restrictive covenant. Notably, one commentator attempting to predict the legal effect of the PCA described the potential for "a fundamental shift in the balance of power from private property owners to" homeowners associations, which he characterized as "private governments." 2 Webster's Real Estate Law § 30A-1, at 1231.[4] Because defendant's proposed interpretation of the PCA would infringe upon a homeowner's existing common law property rights as well as the common *737 law rule that the intentions of the parties control the scope of existing restrictive covenants, we must strictly construe N.C.G.S. § 47F-3-102 and reject defendant's more expansive interpretation.
The language of N.C.G.S. § 47F-3-102 does not, in and of itself, authorize defendant to exercise the powers listed therein. First, the statute uses the word "may" when listing association powers. N.C.G.S. § 47F-3-102. The word "may," when used in a statute, is generally construed as permissive rather than mandatory. In re Hardy, 294 N.C. 90, 97, 240 S.E.2d 367, 372 (1978); Felton v. Felton, 213 N.C. 194, 198, 195 S.E. 533, 536 (1938). Therefore, the statute does not require homeowners associations to wield the enumerated powers, but merely provides them an option to do so. Second, the statute explicitly states that the listed powers are "subject to the provisions of the articles of incorporation or the declaration." N.C.G.S. § 47F-3-102 (emphasis added). The word "subject," in this context, means "contingent on or under the influence of some [other] action." Merriam Webster's Collegiate Dictionary 1172 (10th ed. 1998). In common legal parlance, the phrase "subject to" is defined as "[l]iable, subordinate, subservient, inferior, obedient to; governed or affected by." Black's Law Dictionary 1594; see also State v. Coker, 312 N.C. 432, 435, 323 S.E.2d 343, 347 (1984) (construing the same phrase). Thus, the General Assembly explicitly acknowledged that the powers described in N.C.G.S. § 47F-3-102 were contingent on, subordinate to, and governed by the legal instruments creating a homeowners association.[5]
Interpreted as a whole, this statute does not automatically grant the listed powers to all homeowners associations. Instead, it appears N.C.G.S. § 47F-3-102 merely allows the alteration of an association's declaration, articles of incorporation, and by-laws to permit the exercise of these powers by associations in existence prior to 1999. Since these documents control the number and type of legal powers that a homeowners association may exercise under the PCA, the outcome of the present case turns on the language of the specific organizational documents at issue.

II.
In turning to interpret defendant's organizational documents, we are mindful that, like all other restrictive covenants, this declaration must be "strictly construed in favor of the unrestricted use of property." Rosi v. McCoy, 319 N.C. 589, 592, 356 S.E.2d 568, 570 (1987); see also J.T. Hobby, 302 N.C. at 70, 274 S.E.2d at 179; Cummings v. Dosam, Inc., 273 N.C. 28, 32, 159 S.E.2d 513, 517 (1968). "The law looks with disfavor upon covenants restricting the free use of land.... Any doubt or ambiguity will be resolved against the validity of the restriction." Cummings, 273 N.C. at 32, 159 S.E.2d at 517; see also Stegall v. Housing Auth. of Charlotte, 278 N.C. 95, 100, 178 S.E.2d 824, 828 (1971).
The articles of incorporation and bylaws at issue do not authorize defendant to fine anyone. The articles of incorporation provide that defendant may exercise its powers and perform its duties only "as set forth in the Declaration." Under the articles, defendant is empowered to collect only "charges and assessments" and may do so "by any lawful means ... pursuant to the terms of the Declaration." The bylaws provide that defendant's board may exercise only those powers delegated to it under the articles of incorporation, declaration, or other bylaws. In terms of a monetary collection of any sort, the bylaws speak only to "assessments" and refer to article V of the declaration for more explicit guidance. The articles of incorporation and bylaws limit defendant's *738 powers to those described in the declaration, and therefore, it is only in the declaration that one finds any detailed description of defendant's powers.
Article V of the declaration, six and onehalf pages and fourteen sections long, provides a description of assessments and how they are levied and collected. Assessments are collected solely for the purpose of fairly apportioning the cost of maintaining the subdivision's common areas. Article V provides a specific process for calculating assessments, as well as a means of enforcing and collecting arrearages. These charges clearly constitute an annual contractual obligation of all association members, however, and are not punitive in nature. This interpretation is consistent with the common legal definition of an assessment: "the process of ascertaining and adjusting the shares respectively to be contributed by several persons towards a common beneficial object according to the benefit received." Black's Law Dictionary 149-50. On the other hand, a "fine," as discussed above, is penal in nature. Neither party contends that article V is controlling, as this case clearly involves a fine rather than an assessment. Article V is instructive, however, insofar as it demonstrates that where the original parties to the declaration intended to provide defendant with a specific power to impose a monetary obligation on association members, they were capable of doing so and in fact provided a detailed procedure for doing so.
Article VII, the article relevant to the instant case, specifically describes the ACC's power to withhold its official approval as to any construction proposal. In contrast to article V, which provides a clear outline of powers that defendant may exercise and the appropriate procedures for doing so, article VII does not expressly describe any power or procedure for collecting "fines" from association members as a result of alleged violations of the architectural controls. Therefore, the architectural controls outlined in article VII are presumably enforced pursuant to the general enforcement provisions found in article VIII. Cf. Security Nat'l Bank v. Educators Mut. Life Ins. Co., 265 N.C. 86, 93, 143 S.E.2d 270, 275 (1965) (a contract must be interpreted as a whole and in the context of all its provisions).
Article VIII permits defendant, in a proceeding at law or equity, "to restrain violation or to recover damages resulting from any violation of the terms of the declaration." "Presumably the words which the parties select [for inclusion in a contract are] deliberately chosen and are to be given their ordinary significance." Briggs v. American & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960). Article VIII does not mention "fines" as a proper method for ensuring performance of the covenants. In a typical action for breach of a real estate covenant, "the measure of damages is the amount which will compensate the injured party for the loss which fulfillment of the contract could have prevented or the breach of it has entailed." Norwood v. Carter, 242 N.C. 152, 155, 87 S.E.2d 2, 4 (1955). "[T]he chief concern ... is to make the plaintiff whole and to secure to him his rights under the contract." Martin v. Stiers, 165 F.Supp. 163, 167 (M.D.N.C.1958) (citing Norwood, 242 N.C. 152, 87 S.E.2d 2), aff'd per curiam, 264 F.2d 795 (4th Cir.1959). In certain cases, a court may issue a mandatory injunction to restrain a violation. See, e.g., Ingle v. Stubbins, 240 N.C. 382, 82 S.E.2d 388 (1954) (mandatory injunction issued to require the removal of a building constructed in violation of a restrictive covenant). As discussed above, a fine is generally imposed purely as a pecuniary penalty and has no relation to an actual loss suffered by a party. A fine is not listed in article VIII as a proper means of enforcing the declaration and is a remedy wholly distinct from those listed. Therefore, article VIII does not grant defendant the power to impose a fine on plaintiffs.
Moreover, the architectural standards in effect when this action arose do not properly authorize defendant to issue fines. In order to be binding against subsequent purchasers such as plaintiffs, restrictive covenants must not only be in writing, Cummings, 273 N.C. at 32, 159 S.E.2d at 517, but also must be duly recorded, Hege v. Sellers, 241 N.C. 240, 248, 84 S.E.2d 892, 898 (1954). Prior to enactment of the PCA and in the absence of express covenants placed in each *739 conveyed deed, a developer could legally bind purchasers of his subdivided lots to restrictive covenants only by recording a development plat and a declaration that carefully described any restrictions on the use of the subdivided lots, along with any relevant amendments thereto. See 2 Webster's Real Estate § 18-4, at 833; see also N.C.G.S. §§ 47-21, 47-30(g) (2001) (permitting recorded deeds to incorporate other recorded instruments by reference); Kaperonis v. N.C. State Highway Comm'n, 260 N.C. 587, 597-98, 133 S.E.2d 464, 471 (1963) (where lots are sold by reference to a recorded plat, the effect of the reference is to incorporate the plat into the deed).
Article VII permits defendant to provide "objective standards and guidelines" for the construction approval process but does not authorize the creation of a separate mechanism for enforcing architectural standards. Although the architectural standards adopted by defendant's board purport to grant defendant a fining power, these standards never became part of the recorded declaration and therefore cannot be enforced as mere amendments to or extensions of the restrictive covenants discussed above. To the extent the architectural standards provide "objective standards and guidelines" that aid in the construction approval process, they fulfill a valid role described in the recorded declaration. The standards are unenforceable for lack of recordation, however, to the extent they purport to authorize defendant to levy fines against plaintiffs.
The declaration presents no ambiguity as to the lack of defendant's power to fine plaintiffs. Even if the language of the declaration was ambiguous, any proper interpretation would rely upon the circumstances existing at the time the covenant was created. Runyon, 331 N.C. at 305, 416 S.E.2d at 186; Long, 271 N.C. at 268, 156 S.E.2d at 239. The surrounding circumstances provide valuable insight as to the mutual intentions and expectations of the parties. A particularly important circumstance to consider is the law existing at the time the covenant was created. A real estate covenant is a contract, and parties are generally presumed to take into account all existing laws when entering into a contract. Poole & Kent Corp. v. C.E. Thurston & Sons, Inc., 286 N.C. 121, 129, 209 S.E.2d 450, 455 (1974). "It is a well recognized principle of law in this jurisdiction that the laws in force at the time of the execution of a contract become a part of the contract. This embraces laws which affect the contract's validity, construction, discharge and enforcement." Pike v. Wachovia Bank & Tr. Co., 274 N.C. 1, 16, 161 S.E.2d 453, 465 (1968). "Contracts should be interpreted in the light of established principles of law." Goodyear v. Goodyear, 257 N.C. 374, 377, 126 S.E.2d 113, 116 (1962).
Prior to the enactment of the PCA, restrictive covenants were generally enforceable only by an action at law for damages or by a suit in equity for an injunction. 9 Richard R. Powell, Powell on Real Property § 60.07 (1997); 2 Webster's Real Estate § 18-4, at 832; see generally Runyon, 331 N.C. at 299-313, 416 S.E.2d at 182-91 (discussing the enforcement of restrictive covenants at law and equity). Here, the parties acknowledged this principle of law and expressly memorialized it in the declaration: In the event of breach, the declaration permits defendant to sue for resulting money damages or to seek an appropriate injunction. If the restrictive covenants at issue here were construed to grant defendant the power to fine, defendant would be permitted to impose financial punishment for construction of unapproved structures in addition to recouping any compensable loss or halting the undesired construction. As explained above, the declaration does not expressly describe any such power. In view of the lack of any such express language and considering the mechanisms for enforcement of restrictive covenants commonly accepted prior to enactment of the PCA, we cannot say that the parties to the declaration ever contemplated that defendant would have the power to fine homeowners in Harrington Grove.
In short, the organizational documents for Harrington Grove do not expressly empower defendant to fine plaintiffs for violations of the architectural standards. In light of the legal rule that restrictive covenants must be strictly construed, Rosi, 319 N.C. at 592, 356 S.E.2d at 570, we decline to *740 create such a power by implication. "The courts are not inclined to put restrictions in deeds where the parties left them out." Hege, 241 N.C. at 249, 84 S.E.2d at 899.

III.
Our holding does not prevent recently created homeowners associations from fining their members in appropriate circumstances. The PCA applies in its entirety to all homeowners associations formed on or after 1 January 1999. Any person purchasing real estate in such a planned community can reasonably be charged with constructive notice of the prospective operation of the PCA and the powers it confers upon their homeowners association. See Poole & Kent, 286 N.C. at 129, 209 S.E.2d at 455 (parties to a contract are presumed to act with full knowledge of the existing law); cf. Paul L. Whitfield, P.A. v. Gilchrist, 348 N.C. 39, 43-44, 497 S.E.2d 412, 415 (1998) (statute serves as public notice that compliance with its terms is required). Automatic application of PCA provisions to homeowners associations created on or after 1 January 1999 may therefore be viewed as consistent with the reasonable legal expectations of buyers purchasing homes in planned communities created after that date. We note, however, that the relevant legal instruments creating a homeowners association may withhold the statutory powers described under N.C.G.S. § 47F-3-102 from a homeowners association, if those instruments expressly so provide.
Similarly, our holding does not forbid defendant, or any other homeowners association formed prior to 1999, from taking advantage of the statutory powers created under the PCA, provided the legal authority for the exercise of those powers is properly established. Where the declaration of a homeowners association created prior to 1999 is silent as to whether an association has the power to fine its own members, but provides, as the instant declaration does, for amendment of the declaration provisions, the homeowners association may certainly obtain the power to fine its members as described under N.C.G.S. § 47F-3-102(12) by following the prescribed amendment procedure and by adding appropriate language to the declaration.[6]
Finally, we do not decide any issue as to the effect of N.C.G.S. § 47F-3-102 on an association formed prior to 1999 where the corresponding declaration expressly provides the homeowners association the power to fine its members. This is not an issue drawn into focus by these proceedings, and to reach this question would be to render an unnecessary advisory opinion. It is no part of the function of the courts to issue advisory opinions. City of Greensboro v. Wall, 247 N.C. 516, 519, 101 S.E.2d 413, 416 (1958).
Accordingly, we reverse the decision of the Court of Appeals and remand to that court for further remand to the Superior Court, Wake County, for entry of summary judgment in favor of plaintiffs.
REVERSED AND REMANDED.
NOTES
[1] The General Assembly has since amended N.C.G.S. § 47F-1-102. Act of Aug. 27, 2002, ch. 112, 2002 N.C. Sess. Laws 271; N.C.G.S. § 47F-1-102 (Supp.2002). As noted throughout this opinion, the amendment has altered the relevant statutory language.
[2] In 2002, the General Assembly essentially codified this commentary as part of N.C.G.S. § 47F-1-102(c). Ch. 112, 2002 N.C. Sess. Laws at 272-73. Compare N.C.G.S. § 47F-1-102 (2001) with N.C.G.S. § 47F-1-102 (Supp.2002).
[3] While planned communities like the one at issue here are similar to condominiums in some respects, homeowners in such planned communities do not own undivided interests in common areas of the subdivision. 2 James A. Webster, Webster's Real Estate Law in North Carolina § 30-2(a), at 1304 (Patrick K. Hetrick & James B. McLaughlin, Jr., eds., 5th ed. 1999) [hereinafter Webster's Real Estate]. Condominiums are governed by N.C.G.S. ch. 47C. Id. No issue is raised in this case as to N.C.G.S. ch. 47C.
[4] Approximately twenty million housing units, home to approximately fifty million Americans, are governed by homeowners associations and similar entities. Community Associations Institute, Data on U.S. Community Associations, at http://www.caionline.org/about/facts.cfm (2003). Units governed by such associations account for an estimated four out of every five housing starts in the past five to eight years. Id.
[5] Notably, after the 2002 amendments, the PCA expressly provides that its provisions "do not invalidate existing provisions of the declaration, bylaws, or plats and plans of those planned communities." Ch. 112, sec. 2, 2002 N.C. Sess. Laws at 271; N.C.G.S. § 47F-1-102(d) (Supp.2002). While this subsequent amendment obviously does not control our disposition of the present case, it appears the legislature intended to clarify and codify the originally intended meaning of the PCA's provisions. See Spruill v. Lake Phelps Vol. Fire Dep't, Inc., 351 N.C. 318, 323, 523 S.E.2d 672, 676 (2000) (in construing a statute with reference to an amendment, the legislature presumably either alters or clarifies the statute's meaning).
[6] We note that the PCA, as amended, prescribes an amendment process for associations created prior to 1999. Ch. 112, sec. 2, 2002 N.C. Sess. Laws at 272-73; N.C.G.S. § 47F-1-102 (Supp. 2002).